# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                               No. CR 18-1105 JB

JOSE JESUS CRUZ,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant Jose Jesus Cruz's Motion to Suppress Evidence and Statements, filed October 22, 2018 (Doc. 25)("Motion"). The Court held an evidentiary hearing on January 25, 2019. <u>See</u> Clerk's Minutes at 1, filed January 25, 2019 (Doc. 41). The primary issues are: (i) whether Bernalillo County[1] Sheriff's Office ("BCSO") deputies had probable cause that Defendant Jose Jesus Cruz was engaged in drug trafficking in September, 2017, based on the knowledge that Cruz trafficked drugs while on federal probation in 2016; on the August, 2017, statement of a confidential informant ("CI") that Cruz was trafficking drugs; on a September, 2017, statement from a confidential source ("CS") that the CS obtained methamphetamine from Cruz; on a telephone conversation between Cruz and the CS in which they planned a drug transaction outside Cruz' residence; on Cruz' appearance at the drug transaction's location; and on Cruz' running from the BCSO deputies at the transaction's location and into his residence; (ii) whether, based on the same facts, BCSO deputies had probable cause that Cruz possessed drugs; (iii) whether drug trafficking is a "serious crime" for purposes of a warrantless

---

[1]Bernalillo County is in the State of New Mexico.

entry into a home for the destruction-of-evidence exception to the warrant requirement; (iv) whether methamphetamine possession is a "serious crime" for purposes of a warrantless entry into a home for the destruction-of-evidence exception to the warrant requirement; (v) whether destruction of evidence was likely when Cruz ran from the BCSO deputies at the transaction's location and into his residence; (vi) whether Cruz' running from the BCSO deputies and into his residence indicated an exigency that the BCSO deputies did not manipulate or abuse; (vii) whether the BCSO deputies were in hot pursuit of Cruz; and (viii) if the BCSO deputies entered Cruz' residence unlawfully, whether the unlawful entry tainted Cruz' consent to the BCSO deputies' search of his home and vehicles. The Court concludes that: (i) based on the facts recited above, the BCSO deputies had probable cause that Cruz was engaged in drug trafficking, or, at least, that Cruz was attempting to traffic drugs; (ii) based on the same facts, the BCSO deputies had probable cause that Cruz possessed drugs, specifically methamphetamine; (iii) drug trafficking is a "serious crime" for the purpose of a warrantless entry into a home under the destruction-of-evidence exception to the warrant requirement; (iv) methamphetamine possession is a "serious crime" for the purpose of a warrantless entry into a home under the destruction-of-evidence exception to the warrant requirement; (v) destruction of evidence was likely when Cruz ran from the BCSO deputies and into his residence; (vi) Cruz' running from the BCSO deputies and into his residence indicated an exigency that the BCSO deputies did not manipulate or abuse; (vii) the BCSO deputies were in hot pursuit of Cruz; and (viii) because the BCSO deputies lawfully entered Cruz' residence, no unlawful entry tainted Cruz' consent to search and the exclusionary rule does not apply. Accordingly, the Court will not suppress the evidence obtained pursuant to the search and denies the Motion.

# FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d) purposes. The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure. See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so doing, the court is not bound by evidence rules, except those on privilege."). Thus, the Court may consider hearsay in ruling on a motion to suppress. See United States v. Lopez-Carillo, 536 F. App'x 762, 768-69 (10th Cir. 2013)(unpublished)[2]("[T]he Supreme Court

---

[2]United States v. Lopez-Carillo is an unpublished opinion, but the Court can rely on an unpublished opinion for the United States Court of Appeals for the Tenth Circuit to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this Circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that United States v. Lopez-Carillo, United States v. Reed, 195 F. App'x 815 (10th Cir. 2006)(unpublished), United States v. Mongold, 528 F. App'x 944 (10th Cir. 2013), United States v. Famiglietta, 164 F. App'x 695 (10th Cir. 2006)(unpublished), United States v. Canas, 462 F. App'x 836 (10th Cir. 2012)(unpublished), United States v. Ramirez-Fragozo, 490

has made it clear hearsay is admissible in suppression hearings. . . .  As a result, the restriction in the Confrontation Clause against admission of testimonial statements . . . is not implicated here. (citing United States v. Matlock, 415 U.S. 164, 172-77 (1974); United States v. Sanchez, 555 F.3d 910, 922 (10th Cir. 2009); United States v. Miramonted, 365 F.3d 902, 904 (10th Cir. 2004)).

1. Gerald ("Jerry") Koppman is a BCSO detective and a member of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Task Force.  See Draft Transcript of Hearing at 4:7-9 (taken January 25, 2019)(Koppman)("Tr.").[3]

2. As a member of the ATF Task Force, Koppman investigates serious crimes, including "felons carrying guns, drug traffickers that also use guns[, and] violent subjects," and "serve[s] as backup for local authorities when they're handling high level cases."  Tr. at 4:12-19 (Koppman, Stanford).

3. Around 2016, Koppman learned of a "fairly large scale narcotics trafficker that they called Chino."  Tr. at 4:25-5:1 (Koppman).  See Detective Supplemental Report at 2, filed October 22, 2018 (Doc. 25-1).

4. Koppman later learned that "Chino" was Cruz and that Cruz was on federal probation.  See United States' Response to Defendant's Motion to Suppress ¶ 1, at 1, filed November 13, 2018 (Doc. 31)("Response"); Tr. at 5:1-4 (Koppman).

---

F. App'x 125 (10th Cir. 2012)(unpublished), Garrison v. City of Cushing, 5 F.3d 545, 1993 WL 332284 (10th Cir. 1993)(unpublished table opinion), and United States v. Jackson, 139 F. App'x 83 (10th Cir. 2005)(unpublished), have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

[3]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

5.      Through the United States Probation Office, Koppman organized a meeting with Cruz, and, at the meeting, Cruz admitted to trafficking drugs and agreed to cooperate with Koppman's then-ongoing investigation.  See Response ¶ 1, at 1-2; Tr. at 5:6-16 (Koppman).

6.      Cruz revealed to Koppman a "violent narcotics trafficker['s]" residence.  Tr. at 5:24-25 (Koppman).  See id. at 5:20-6:10 (Stanford, Koppman).

7.      After that investigation, Koppman did not use Cruz as a cooperator again or "sign him up" as "an official informant."  Tr. at 5:18-7:7 (Stanford, Koppman).

8.      "On or around August 4, 2017," the CI informed Koppman "that an individual . . . identified as 'Chino' was distributing considerable amounts of methamphetamine and heroin."  Response ¶ 2, at 2.  See Response ¶1, at 1; Tr. at 7:12-15 (Koppman); Detective Supplemental Report at 2.

9.      In Koppman's Detective Supplemental Report, Koppman labeled the CI a "confidential informant," because the BCSO recorded the CI as an "informant."  Tr. at 10:1-3 (Koppman).

10.     The CI described Chino's cars and the intersection near Chino's residence, and Koppman recognized the cars and the residence as Cruz' cars and residence, and the CI identified that "Chino" was Cruz in an image that Koppman showed the CI.  Response ¶ 2, at 2.  See Response ¶1, at 1; Tr. at 7:15-17 (Koppman); Detective Supplemental Report at 2.

11.     The CI also informed Koppman about a subject with "a large amount of methamphetamine," Tr. at 7:19-20 (Koppman), who "had recently traded guns for drugs" with "Chino," Response ¶ 3, at 3.  See Response ¶1, at 1; Detective Supplemental Report at 2.

12.     Koppman obtained a search warrant in relation to this subject, and, on September 5, 2017, Koppman contacted the subject when BCSO deputies executed the search warrant.  See Response ¶1, at 1; Tr. at 34:23-35:3 (Bhalla, Koppman); id. at 36:7-11 (Bhalla, Koppman); Detective Supplemental Report at 2.

13.     The subject became the CS.  See Response ¶ 3, at 2.

14.     Koppman identified the CS as a "confidential source," because the CS began sharing information "immediately" when the BCSO deputies executed the search warrant.  Tr. at 10:3-6 (Koppman).

15.     The CS identified a picture of Cruz, and told Koppman that Cruz supplied the CS' narcotics and "regularly sells methamphetamine."  Tr. at 7:18-23 (Koppman).  See Response ¶ 4, at 2; Tr. at 10:20-23 (Koppman); Detective Supplemental Report at 2-3.

16.     Koppman verified the CS's knowledge "by quizzing the CS about other known drug traffickers, and other information to which Koppman already knew the answers."  Response ¶ 5, at 2.

17.     The CS divulged to Koppman text messages between Cruz and the CS in which the two individuals discussed recent "drug transactions."  Response ¶ 5, at 2-3.  See Tr. at 10:13-20 (Koppman); Detective Supplemental Report at 3.

18.     The CS told Koppman that Cruz and the CS traded drugs at the intersection of Lansing and Airway, which Koppman recognized as the intersection near Cruz' residence.  See Tr. at 8:3-7 (Koppman).

19.     The CS informed Koppman that, "at times," the CS stored Cruz' methamphetamine, because Cruz "was on federal probation."  Tr. at 8:17-18 (Koppman).

20.     Koppman "concluded the CS was being truthful." Response ¶ 5, at 3.

21.     "On September 5, 2017, Koppman asked CS to call and request a purchase of methamphetamine from Defendant." Response ¶ 6, at 3. <u>See</u> Tr. at 20:25-21:6 (Stanford, Koppman); Detective Supplemental Report at 3

22.     The CS ordered several ounces of methamphetamine. <u>See</u> Tr. at 13:12-13 (Koppman); <u>id.</u> at 17:9-12 (Stanford, Koppman).

23.     Cruz agreed to make the drug sale to the CS after Cruz left work. <u>See</u> Response ¶ 6, at 3; Tr. at 8:13-14 (Koppman); Detective Supplemental Report at 3.

24.     Several ounces of methamphetamine is "a trafficking amount," Tr. at 17:15 (Koppman), that is "dangerous to the public," Tr. at 17:17-18 (Stanford). <u>See id.</u> at 17:17-19 (Stanford, Koppman).

25.     Koppman and other BCSO deputies listened to the call between Cruz and the CS. <u>See</u> Response ¶ 6, at 3; Tr. at 8:12-13 (Koppman); Detective Supplemental Report at 3.

26.     Koppman asked the CS to make the call, because Koppman sought to verify the stories about Cruz' drug trafficking. <u>See</u> Tr. at 20:25-21:6 (Stanford, Koppman).

27.     Koppman did not plan for a drug buy to occur. <u>See</u> Tr. at 21:10-12 (Stanford, Koppman).

28.     Koppman and the other BCSO deputies "then drove to conduct surveillance on Defendant's house" and directed the CS to call them "if/when Defendant called the CS regarding the drug deal." Response ¶ 7, at 3. <u>See</u> Detective Supplemental Report at 3.

29.     Koppman did not believe that Cruz would be storing narcotics at his house. <u>See</u> Response ¶ 7, at 3; Tr. at 8:19-9:3 (Koppman).

30.     Koppman did not plan to enter Cruz' house.  See Tr. at 17:24-18:6 (Stanford, Koppman).

31.     Koppman hoped to surveil Cruz' house to identify from where Cruz would retrieve the drugs or from whom Cruz would receive the drugs before the sale.  See Tr. at 9:3-8 (Koppman); id. at 13:19-14:2 (Koppman).

32.     Koppman intended to convince Cruz to cooperate with the BCSO deputies in investigating a "higher target."  Tr. at 11:14-12:4 (Koppman).  See Response ¶ 7, at 3.

33.     It is "a common investigative tactic" to intercept suspects at drug sales and convince them to cooperate with officers.  Tr. at 18:16 (Stanford).  See Tr. at 18:16-22 (Stanford, Koppman).

34.     Koppman expected that Cruz would be "respectable" and cooperative.  Tr. at 12:17 (Koppman).  See id. at 12:15-23 (Koppman).

35.     Koppman and the other BCSO deputies did not plan to arrest Cruz, because they did not want to expose him "as a cooperator."  Tr. at 22:1 (Stanford).  See id. at 21:13-22:2 (Stanford, Koppman).

36.     If Cruz had narcotics on him, Koppman expected to take the narcotics but still obtain Cruz' cooperation.  See Tr. at 22:6-9 (Stanford, Koppman).

37.     While the BCSO deputies were surveilling Cruz' residence, the CS conveyed that Cruz had told the CS to meet at the intersection outside the residence in fifteen minutes for the drug transaction.  See Response ¶ 8, at 3; Tr. at 13:6-9 (Koppman); id. at 15:10-11 (Koppman).

38.     Cruz gave the CS directions to his house, and told the CS to "park outside of the residence and he would come out."  Detective Supplemental Report at 3.

39.     Around fifteen minutes later, Koppman and the other BCSO deputies observed Cruz leave his home and walk to the intersection while looking around for someone.  See Response ¶ 8, at 3; Tr. at 15:14-17 (Koppman).

40.     Koppman expected such behavior from someone about to engage in a drug transaction.  See Response ¶ 9, at 3-4; Tr. at 15:22-25 (Stanford, Koppman).

41.     Cruz was carrying nothing at the time.  See Tr. at 29:2-17 (Bhalla, Koppman); Detective Supplemental Report at 3.

42.     Koppman believed that Cruz might have drugs on him.  See Tr. at 37:22-38:1 (Stanford, Koppman).

43.     Koppman and the other BCSO deputies, who all wore official BCSO clothing, approached Cruz and "announced their presence," identifying themselves as police.  Response ¶ 10, at 4.  See Detective Supplemental Report at 3.

44.     Cruz ran from Koppman and the other BCSO deputies, and ran into his residence. See Response ¶ 10, at 4; Tr. at 16:20 (Koppman); Detective Supplemental Report at 3-4.

45.     Koppman's plans to communicate with Cruz "in a low-key" manner changed when Cruz ran from him and the other BCSO deputies.  Tr. at 38:18-19 (Koppman).

46.     Koppman and the other BCSO deputies yelled at Cruz to stop.  See Tr. at 37:10-16 (Bhalla, Koppman); Detective Supplemental Report at 4.

47.     Cruz ignored Koppman's and the other BCSO deputies' orders.  See Response ¶ 10, at 4.

48.     When Cruz ran from the BCSO deputies at the location for the drug sale, the BCSO deputies had probable cause that Cruz was engaged in drug trafficking, or, at least, that Cruz was attempting to traffic drugs.

49.     The BCSO deputies also had probable cause that Cruz possessed drugs, specifically methamphetamine.

50.     Koppman and the other BCSO deputies assumed that Cruz ran to destroy evidence. See Response ¶ 10, at 4; Tr. at 16:25-17:8 (Stanford, Koppman).

51.     Cruz was likely to destroy evidence when he ran from the BCSO deputies and into his residence.

52.     Koppman and the other BCSO deputies followed Cruz and entered Cruz' residence close behind him.   See Response ¶ 10, at 4; Tr. at 22:25-23-1 (Koppman); id. at 27:8-10 (Koppman).

53.     The BCSO deputies were in hot pursuit of Cruz.

54.     Drug trafficking is a "serious crime" for the purposes of a warrantless entry into a home under the destruction-of-evidence exception to the warrant requirement.

55.     Methamphetamine possession is also a "serious crime" for the purposes of a warrantless entry into a home under the destruction-of-evidence exception to the warrant requirement.

56.     Cruz' running from the BCSO deputies and into his residence indicated that an exigency existed.

57.     The BCSO deputies did not manipulate or abuse the exigency.

58. On the BCSO deputies' entering the house, Cruz was exiting the bathroom with his "arms wet up to the elbows." Tr. at 23:2-4 (Koppman). <u>See</u> Response ¶ 10, at 4; Detective Supplemental Report at 3-4.

59. The BCSO deputies took Cruz into custody. <u>See</u> Tr. at 23:3 (Koppman).

60. Cruz was wearing a handgun holster and informed Koppman that he "normally carried a firearm in the holster." Response ¶ 10, at 4.

61. Koppman asked Cruz if he had narcotics on his person, and Cruz stated that he had them in his pants. <u>See</u> Detective Supplemental Report at 4.

62. Cruz had "a plastic bag containing approximately 16 grams of methamphetamine and approximately 8 grams of heroin in [his] front pants pocket." Response ¶ 10, at 4. <u>See</u> Detective Supplemental Report at 3.

63. As the CS agreed to purchase methamphetamine from Cruz, <u>see</u> Tr. at 13:12-13 (Koppman); <u>id.</u> at 17:9-12 (Stanford, Koppman), and Koppman and the other BCSO deputies knew about only that agreement when approaching Cruz, <u>see</u> Response ¶ 6, at 3; Tr. at 8:12-13 (Koppman); Detective Supplemental Report at 3, the BCSO deputies had no reason to think that Cruz would have heroin on him.

64. Cruz flushed a maximum of three ounces of methamphetamine "down the toilet as deputies were entering the house." Response ¶ 10, at 4. <u>See</u> Detective Supplemental Report at 4.

65. "A bag of . . . methamphetamine" was in the toilet. Tr. at 23:6-7 (Koppman).

66. The BCSO deputies did not enter any other parts of the house without consent or do more than look in the toilet to locate the methamphetamine. <u>See</u> Tr. at 24:18-25 (Stanford, Koppman).

67.     Cruz "gave signed consent" to the BCSO deputies to search his home and vehicles. Response ¶ 10, at 4.  See Tr. at 25:2-6 (Koppman); Detective Supplemental Report at 4.

68.     Cruz had a Derringer .22 caliber handgun and a Taurus .22 caliber handgun in the living room; a SCCY 9 millimeter handgun in the bedroom; a 9 millimeter handgun in a Honda vehicle; fifteen ounces of methamphetamine in a vehicle's trunk; twenty grams of methamphetamine, which belonged to another individual, in a black purse; and, also in the black purse, twenty grams of heroin and a Kimber 9 millimeter handgun, both of which belonged to Cruz.  See Response ¶ 11, at 5; Tr. at 25:14-22 (Koppman).

69.     All the firearms that the BCSO deputies recovered functioned.  See Response ¶ 12, at 5; Detective Supplemental Report at 5.

70.     Cruz "often trades narcotics to individuals in exchange for firearms."  Response ¶ 11, at 5.

71.     Because the BCSO deputies lawfully entered Cruz' residence, no unlawful entry tainted the BCSO deputies' search and the exclusionary rule does not apply to exclude the evidence obtained pursuant to the entry.

## PROCEDURAL BACKGROUND

On April 10, 2018, a federal Grand Jury indicted Cruz on four counts: (i) being a felon in possession of a firearm in violation of 18 U.S.C. 922(g)(1); (ii) possessing with the intent to distribute more than fifty grams of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B); (iii) possessing with the intent to distribute heroin in violation of 21 U.S.C. §§841(a)(1) and (b)(1)(C); and (iv) carrying a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. 924(c).  See Indictment at 1-2, filed April 10, 2018 (Doc. 1).  Cruz filed the Motion on

October 22, 2018.  See Motion at 14.  In his Motion, Cruz asks that the Court "suppress all evidence recovered during the search of Mr. Cruz's vehicle and residence and all statements made by Mr. Cruz."  Motion at 1.

**1.    The Motion.**

According to Cruz, the United States cannot use evidence obtained in violation of an individual's constitutional rights or "evidence that was obtained as a but-for result of the illegal search unless the evidence is so far removed from the constitutional violation that the 'taint' of the violation no longer clings to it."  Motion at 5 (quoting Wong Sun v. United States, 371 U.S. 471, 484 (1963), and citing United States v. Calandra, 414 U.S. 338, 347 (1974); United States v. Romero, 743 F. Supp. 2d 1281, 1313 (D.N.M. 2010)(Browning, J.), aff'd 749 F.3d 900 (10th Cir. 2014)).  Cruz contends that, because the BCSO deputies unlawfully entered his home, evidence obtained pursuant to the subsequent search is inadmissible.  See Motion at 13.

First, according to Cruz, warrantless entries into homes are prohibited without "probable cause and exigent circumstances," Response at 4 (citing Payton v. New York, 445 U.S. 573, 583-590 (1980)), and Plaintiff United States of America "bears the burden of establishing that exigent circumstances made the warrantless entry necessary," Motion at 4 (citing United States v. Cuaron, 700 F.2d 582, 586 (10th Cir. 1983)).  Cruz explains that "destruction of evidence can qualify as an exigent circumstance in some cases," and, in those cases, the United States Court of Appeals for the Tenth Circuit applies a four-factor test; the search must be:

1. Pursuant to clear evidence of probable cause. [sic]

2. Available only for serious crimes and in circumstances where destruction of evidence is likely

3. Limited in scope to the minimum intrusion necessary to prevent the destruction of evidence; [sic]

4. Supported by clearly defined indicators of exigency that are not the subject to police manipulation or abuse.

Motion at 5 (citing United States v. Rey, 663 F. Supp. 2d 1086, 1109 (D.N.M. 2009)(Browning, J.)).

According to Cruz, the BCSO deputies did not have probable cause to arrest him when they "arrived on scene." Motion at 7. Cruz argues that, "when the controlled buy[4] is not completed in suspected drug trafficking cases, and no other criminal activity is observed, probable cause cannot exist absent some other independent corroboration of illegal activity." Motion at 8 (citing United States v. Aquino, 836 F.2d 1268 (10th Cir. 1988)). Cruz describes that, in United States v. Aquino, the Tenth Circuit "emphasized" that law enforcement did not have probable cause "to believe that illegal drugs were within the defendant's dwelling" before a controlled buy occurred. Motion at 8 (citing United States v. Aquino, 836 F.2d at 1272-73). Cruz contends that, similarly, in his case, "no controlled buy ever occurred," and that law enforcement had no probable cause to arrest him or to enter his home. Motion at 9. Cruz anticipates that the United States might rely on the CI's and the CS' testimony to bolster its argument for probable cause, and argues that

_____

[4]A controlled buy is when, at the direction of a governmental agency, an individual purchases drugs . . . from someone who sells drugs. The individual who makes the purchase may be a law enforcement officer, but more frequently it is an individual who has recently been arrested or charged with a crime. The buy is called "controlled" because the purchaser is under law enforcement's control and monitoring during the buy.

The Straight Dope on Controlled Buys, Nicholson, Gansner & Otis, S.C., https://www.nglawyers.com/blog/2014/06/the-straight-dope-on-controlled-buys.shtml (last visited Jan. 31, 2019).

the CI's and the CS' information is not reliable.  See Motion at 9 (citing United States v. Mathis, 357 F.3d 1200, 1205 (10th Cir. 2004)).  Cruz avers that the CI made "only vague references" to Cruz' drug-dealing, and provided "no dates, amounts or other indications the [sic] demonstrated that Cruz was engaged in ongoing illegal drug activity," and that these statements alone could not establish probably cause.  Motion at 9-10 (citing United States v. Brown, 828 F.3d 375, 383 (6th Cir. 2016)).  Further, according to Cruz, the CI spoke to Koppman "almost one month" before Cruz' arrest, and so such information was stale.  Motion at 10 (United States v. Shomo, 786 F.2d 981, 983 (10th Cir. 1986)).  Cruz then contends that the CS "had a motive to implicate someone else," because the BCSO deputies had just discovered the CS with "a large amount of methamphetamine."  Motion at 10.  Cruz notes that Koppman did not record any specifics that the CS provided about Cruz or the amount of methamphetamine that the CS alleged Cruz to have.  See Motion at 10.

Cruz next argues that the United States cannot show that "any exigent circumstances justified [the BCSO deputies'] warrantless entry" into Cruz' home.  Motion at 11.  Cruz avers that "[t]here was no indication of loss or destruction of evidence when Cruz exited his home or stood outside," and that "nothing at all happened when Cruz stepped outside his home."  Motion at 11-12.  Cruz contends that, if any exigency existed, the BCSO deputies created it.  See Motion at 13.  According to Cruz, unlawful law enforcement conduct includes participating in controlled drug buys in individual's residences, "with the intent of making an arrest," and without "a warrant."  Motion at 12 (citing United States v. Cresta, 825 F.2d 538, 553 (1st Cir. 1987); United States v. Scheffer, 463 F.2d 567, 575 (5th Cir. 1972)).  Cruz cites a New Hampshire case, in which the New Hampshire Supreme Court "held that where police officers chose to pursue a course of actions

which they knew would require an emergency entrances [sic] into a persona's [sic] home, without first obtaining a warrant, the government could not rely on" the exigency. Motion at 12 (citing State v. Santana, 586 A.2d 77, 83 (1991)). According to Cruz, the BCSO deputies had the CS arrange the drug transaction with Cruz "knowing that the buy would occur at Cruz's house" but did not get a warrant. Motion at 13.

### 2. **The Response.**

The United States responds. See Response. The United States briefly indicates that, because the BCSO deputies engaged in no illegality, Wong Sun v. United States and its line do not apply. Response at 12. The United States contends first that the BCSO deputies had probable cause. See Response at 6-8. The United States depicts probable cause as a "totality of the circumstances" analysis. Response at 6 (quoting United States v. Gordon, 173 F.3d 761, 766 (10th Cir. 2007)). The United States disputes that United States v. Aquino controls here, because, according to the United States, in United States v. Aquino, no facts suggested that Aquino might have drugs in his home. See Response at 7. The United States lists that, unlike in United States v. Aquino, in this case, the BCSO deputies knew that Cruz had previously trafficked drugs; had heard from the CI and the CS that Cruz was trafficking drugs; saw text messages confirming the CS' accounts; and heard Cruz confirm with the CS that he would engage in a drug transaction. See Response at 7. The United States explains that law enforcement "did not know whether Defendant kept his drugs at his house or somewhere else," but, according to the United States, Cruz told the CS to meet at Cruz' residence. Response at 7-8. The United States argues that the BCSO deputies saw Cruz leave his residence around the time specified for the transaction and run away after the BCSO deputies identified themselves. See Response at 8. The United States

explains that the BCSO deputies then reasonably believed that Cruz "had drugs in his possession." Response at 8.

The United States further contends that exigent circumstances existed. See Response at 8-12. According to the United States, Cruz created an exigency when he fled the BCSO deputies. See Response at 6. The United States first opines that this case resembles United States v. Santana, 427 U.S. 38 (1976), wherein the Supreme Court upheld "hot pursuit" as an exigency. Response at 8-9. The United States contends that, as in United States v. Santana, here, Cruz ran into his home after the BCSO deputies identified themselves. See Response at 9.

Further, the United States contends that Cruz' possible destruction of evidence created an exigency. See Response at 10. The United States avers that the BCSO deputies had probable cause; believed Cruz to possess drugs and a gun, "which are serious crimes"; and limited their entry into Cruz' residence to the area near the bathroom where they detained Cruz, and to the area to which he subsequently consented to have searched. Response at 10. The United States denies that the BCSO deputies created an exigency. See Response at 11. The United States quotes the Supreme Court's holding from Kentucky v. King, 563 U.S. 452 (2011): "Where, as here, the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment [to the Constitution of the United States], warrantless entry to prevent the destruction of evidence is reasonable and thus allowed." Response at 11 (quoting Kentucky v. King, 563 U.S. at 462). The United States asserts that law enforcement officers do not unlawfully create exigencies when they announce their presence and "cause a drug suspect to destroy evidence," which is what the United States avers occurred here. Response at 11. The United States also cites Kentucky v. King for the proposition that police need not "seek a warrant after probable cause is

established before entering a dwelling to prevent destruction of evidence." Response at 11. The United States contends that, prior to Cruz' running, the BCSO deputies knew neither that Cruz "possessed drugs" nor that "he would run," until Cruz ran. Response at 12.

### 3. The Reply.

Cruz replies in Defendant Jose Cruz's Reply to the Government's Response (Doc. 31) to His Motion to Suppress Evidence (Doc. 25), filed December 27, 2018 (Doc. 39)("Reply"). Cruz first argues that warrantless entries into homes deserve special scrutiny. See Reply at 1-2 (citing United States v. Martinez, 696 F. Supp. 2d 1216 (D.N.M. 2010)(Browning, J.)). Cruz also contends that, if the BCSO deputies had probable cause, they could have obtained a warrant to search Cruz' residence. See Reply at 2. Cruz complains that the BCSO deputies obtained a warrant in their investigation of the CS, but, although the BCSO deputies knew of Cruz' drug trafficking, the BCSO deputies obtained no warrant against him. See Reply at 3-4. Cruz argues that the BCSO deputies' "ultimate goal" is irrelevant. Reply at 4 (quoting Response ¶ 7, at 3). Cruz avers that the BCSO deputies' motivation was to "set up a bust," at which the officers would arrest Cruz or force him to cooperate. See Reply at 4. Cruz distinguishes United States v. Santana, by noting that, in that case, unlike here, the officers observed a drug buy before following the defendant into the home. See Reply at 4-5. Cruz also differentiates Kentucky v. King from these facts and argues that, in Kentucky v. King, again unlike here, the law enforcement smelled marijuana and heard "noises consistent with destruction of evidence" before entering the home. Reply at 5.

4.    **The Hearing**.

The Court and Cruz began the hearing by discussing if and when the Tenth Circuit requires probable cause for warrantless entry in exigent circumstances. See Tr. at 39:20-41:25 (Court, Bhalla). Cruz clarified that the Tenth Circuit does not require probable cause when someone's safety or life are in danger; according to Cruz, at those times, law enforcement needs only reasonable grounds to enter a home. See Tr. at 40:7-24. Cruz explained that the first element for the test for the destruction-of-evidence exception, which Cruz recites in the Motion, requires probable cause. See Tr. at 40:25-41:25 (Bhalla).

Accordingly, Cruz argued first that the BCSO deputies had no probable cause, because, according to Cruz, they had no evidence that Cruz stored drugs in his home, Cruz carried nothing when he left his home, and they observed no drug transaction. See Tr. at 42:1-22 (Bhalla). The Court stated that it understood that the BCSO deputies obtained probable cause when Cruz ran from the BCSO deputies. See Tr. at 42:23-43:4 (Court). Cruz argued that cases clarify that, alone, fleeing the police does not establish probable cause. See Tr. at 43:5-11 (Bhalla). The Court responded that the BCSO deputies had more than Cruz' fleeing, because the BCSO deputies had Cruz' previous drug trafficking, and the CI's and the CS' statements. See Tr. at 43:12-20 (Court). Cruz emphasized that such evidence does not establish probable cause to enter an individual's home. See Tr. at 43:21-24 (Bhalla). The Court returned the conversation to Cruz' running and asserted that it did not see the issue as probable cause to enter Cruz' home. See Tr. at 43:25-44:4 (Court). Cruz cited several cases about probable cause, beginning with United States v. Mongold, 528 F. App'x 944, 949 (10th Cir. 2013)(unpublished), wherein the Tenth Circuit stated that a drug trafficking tip should be corroborated with evidence such as a controlled buy, or surveillance

revealing many people going to and leaving from a residence. See Tr. at 44:13-45:1 (Bhalla). Cruz stated that, in United States v. Cook, No. CR 15-3224 WJ, 2016 WL 9488763 (D.N.M. 2016)(Johnson, J.), the Honorable William P. Johnson, Chief United States District Judge for the District of New Mexico, concluded that probable cause existed after law enforcement observed a controlled buy and that, in United States v. Aranda-Diaz, No. CR 12-2686 JB, 2013 WL 4446801 (D.N.M. 2012)(Browning, J.), the Court stated that a controlled buy corroborated a tip to establish probable cause. See Tr. at 45:2-12 (Bhalla). Cruz also repeated that, in United States v. Aquino, the Tenth Circuit emphasized that law enforcement had no probable cause before a controlled drug buy occurred, but Cruz conceded that no confidential informant provided information in that case. See Tr. at 45:12-23 (Bhalla). Cruz reiterated that establishing probable cause requires a controlled buy, surveillance, or other investigative action. See Tr. at 45:25-46:5 (Bhalla). Cruz argued that the United States cannot "bootstrap" the 2016 conversation with Cruz into a probable cause argument, because, in 2017, the BCSO deputies did not know that Cruz was engaged in drug trafficking. See Tr. at 46:5-9 (Bhalla). The Court returned to the CI's and the CS' roles, and asserted that, if law enforcement receives a tip, the Court must consider the source's veracity and reliability. See Tr. at 54:23-55:6 (Court). Cruz stated that Koppman did not verify the CS' information. See Tr. at 55:7-20 (Bhalla).

Cruz continued, arguing that the second element of the test for the destruction-of-evidence exception -- that the crime be a serious crime "in circumstances where destruction is likely" -- is not satisfied. Tr. at 46:19 (Bhalla). According to Cruz, United States v. Mongold discusses that drug possession alone -- without evidence of drug trafficking -- does not qualify as a serious crime. See Tr. at 46:20-47:9 (Bhalla). Cruz contends that, here, the BCSO deputies had "no evidence that

Mr. Cruz was actually trafficking . . . .  All they had at most is some belief that Mr. Cruz had drugs on his person." Tr. at 47:10-13 (Bhalla).

Cruz transitioned to discussing whether he was likely to destroy evidence.  See Tr. at 47:22-23 (Bhalla).  Cruz cited Thomas v. Vaughn, No. 2:93-CV-925 PGC, 2006 WL 2375657 (D. Utah Aug. 11, 2016)(Cassell, J.), in which "the Court held [that] the mere possibility that . . . evidence could be destroyed is insufficient to create an [exigency.]  You've got to have evidence that the destruction is really happening." Tr. at 48:5-8 (Bhalla).  Cruz also cites Ludlow v. State, 314 N.E. 2d 750 (Ind. 1974), in which the Indiana Supreme Court discusses that the destruction-of-evidence exception applies when law enforcement must act quickly to prevent actual destruction.  See Tr. at 48:9-15 (Bhalla).  Cruz summarizes that, in destruction-of-evidence cases, law enforcement officers usually hear or see signs that individuals are destroying evidence, and that the BCSO deputies did not make such observations at his residence.  See Tr. at 48:15-22 (Bhalla).

Cruz conceded that he did not need to discuss the third element in the test -- whether the intrusion was limited.  See Tr. at 48:22-49:3 (Bhalla).  Cruz turned to the fourth factor -- whether the exception was "supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse," United States v. Aquino, 836 F.2d at 1272 -- and argued that, in State v. Santana, 586 A.2d 77 (N.H. 1991), the New Hampshire Supreme Court concluded that, where police have probable cause and time to obtain a warrant, law enforcement should obtain a warrant, see Tr. at 49:17-50:5 (Bhalla).  Cruz argues that Koppman and the other BCSO deputies took the non-warrant route, although Koppman knew that the drug transaction would occur outside Cruz' residence.  See Tr. at 49:17-50:13 (Bhalla).  The Court questioned whether the exigency was not that Cruz had drugs on his body and ran into his home to dispose of the drugs.  See Tr. at

50:14-22 (Court).  Cruz responded that, in situations like his, when law enforcement officers know that a drug transaction will occur outside a suspect's residence, the law enforcement officers should know that the suspect might run into the residence, as he did.  See Tr. at 50:23-51:3 (Bhalla).  Cruz emphasized that courts should oversee law enforcement in such scenarios, because the Fourth Amendment promises respect for the home.  See Tr. at 51:3-9 (Bhalla).  The Court pressed that, in controlled drug buys, law enforcement officers rarely get warrants, see Tr. at 51:23-52:1 (Court), and Cruz responded that, "no, they go get the warrant after.  Because watching the controlled buy gives them . . . probable cause to then go apply for a warrant," Tr. at 52:2-5 (Bhalla).  Cruz argued that, even with his running, the BCSO deputies did not have probable cause.  See Tr. at 53:9-18 (Court, Bhalla).  Cruz asserted that the Fourth Amendment so protects homes that, if law enforcement officers do not have probable cause, they should wait for a crime to occur if they cannot get a warrant before the crime occurs.  See Tr. at 53:16-54:2 (Court, Bhalla).  Cruz cited United States v. Radka, 904 F.2d 357 (6th Cir. 1990); United States v. Richards, 994 F.2d 244 (5th Cir. 1993); United States v. Scheffer, 463 F.2d 567 (5th Cir. 1972), Buchanan ex re. Estate of Buchanan v. Maine, 417 F. Supp. 2d 45 (D. Me. 2006)(Woodcock, J.), in which the courts stated that, where officers have time and/or control a drug buy, the officers should obtain warrants.  See Tr. at 55:20-56:24 (Bhalla).  Cruz argues that the United States relies on Kentucky v. King, but, in that case, unlike here, the detectives observed a controlled buy outside a home and heard sounds indicating the destruction of evidence within the home.  See Tr. at 57:6-58:5 (Bhalla).  Cruz also emphasized the protection that the Supreme Court has guaranteed for the home.  See Tr. at 58:9-61:18 (Bhalla)(citing United States v. Jones, 565 U.S. 400 (2012); Florida v. Jardines, 569 U.S. 1 (2013)).

First, the United States responded that caselaw does not require a controlled buy or a crime to have occurred to establish probable cause. See Tr. at 61:25-62:6 (Stanford). The Court clarified that the United States argued that the BCSO deputies did not have probable cause immediately when Cruz left his home. See Tr. at 62:7-11 (Court). The United States agreed that the running established probable cause. See Tr. at 62:18-20 (Stanford). The United States argued that, here, where Koppman knew that Cruz had previously trafficked drugs; the CI and the CS informed Koppman that Cruz was selling drugs again; Koppman checked the CI's and the CS' information; the CS set up a drug deal with Cruz; and Koppman observed Cruz walking toward the drug deal in a manner similar to the manner of people engaged in drug transactions, Koppman could "conduct an investigative detention." Tr. at 62:24-63:19 (Stanford). The Court clarified that the parties were not debating an investigative detention. See Tr. at 63:23-24 (Court). The United States confirmed the Court's assessment and agreed that probable cause developed when Cruz ran from the BCSO deputies. See Tr. at 64:2-17 (Court, Stanford). The Court suggested, and the United States concurred, that Cruz' running indicated that Cruz had drugs on his body, which he intended to destroy, and that this action established probable cause. See Tr. at 64:22-65:7 (Court, Stanford).

The United States next argued, regarding the exigency test's second element, that Kentucky v. King gives "guidance" and contended that, because the CS ordered methamphetamine in an amount dangerous for the streets, a serious crime occurred. See Tr. at 65:12-66:2 (Stanford). Turning to the third factor, the United States then explained that the BCSO deputies followed Cruz to the bathroom and minimally intruded into Cruz' residence without his consent. See Tr. at 66:13-19 (Stanford). Last, the United States contended, regarding the fourth prong -- that the police not

have created the exigency -- that the Supreme Court stated in <u>Kentucky v. King</u> that police do not create an exigency if they do not engage in or threaten conduct violating the Fourth Amendment. <u>See</u> Tr. at 66:19-67:12 (Stanford). The United States contended that Koppman explained that the BCSO deputies did nothing to violate the Fourth Amendment and that Cruz ran when the BCSO deputies identified themselves. <u>See</u> Tr. at 67:14-68:13 (Stanford). The United States emphasized that Koppman verified the CS' information and that the BCSO deputies did not need to know whether the destruction of evidence was extremely imminent. <u>See</u> Tr. at 68:14-69:2 (Stanford).

Cruz reiterated again that the BCSO deputies did not have probable cause, and that the BCSO deputies admitted that the CI's and the CS' information did not establish probable cause. <u>See</u> Tr. at 49:25-70:10 (Bhalla). According to Cruz, if the BCSO deputies had probable cause, they would have obtained a warrant. <u>See</u> Tr. at 70:11-15 (Bhalla). Cruz also repeated that, although the parties focused on probable cause, the United States still must satisfy the other factors and that the exigency analysis fails. <u>See</u> Tr. at 70:15-25 (Bhalla). The Court asked Cruz what additional evidence he believed was required to establish that an exigency existed, because the Court understood the situation as someone running into a residence to destroy drugs. <u>See</u> Tr. at 71:1-7 (Court). Cruz asserted that, in other cases, law enforcement officers observed or heard signs of doors and people running around to destroy evidence. <u>See</u> Tr. at 11-16 (Bhalla). The Court asked whether the BCSO deputies had to wait until they heard the flushing, which would mean that Cruz had destroyed the evidence. <u>See</u> Tr. at 72:3-5 (Court). Cruz argued that sometimes the law enforcement officers observed signs of destruction, but in all the cases, the law enforcement officers knew that the defendant had evidence to destroy, because they had witnessed a drug transaction. <u>See</u> Tr. at 72:7-10 (Bhalla). Cruz also emphasized that the Court needed to

consider whether possessing drugs -- rather than trafficking drugs -- is a "serious crime."  Tr. at 73:15 (Bhalla).  See id. at 73:10-15 (Bhalla).  Cruz argued that the law-enforcement-abuse question is objective and that, in a situation like the one in which the BCSO deputies arrested him, law enforcement officers do not act reasonably if they do not have a warrant.  See Tr. at 73:15-74:9 (Bhalla).

The Court indicated its inclination to deny the motion.  See Tr. at 74:19-20 (Court).  The Court summarized that Koppman and the other BCSO deputies had information to establish probable cause and that running into the house seemed to satisfy the test for an exigency based on the destruction of evidence.  See Tr. at 74:19-75:4 (Court).  The Court indicated that once an individual flushes evidence down the toilet, the evidence is gone.  See Tr. at 75:3-5 (Court).  The Court indicated that it would need to consider the seriousness of the crime but that it would file an opinion on the Motion.  See Tr. at 75:5-7 (Court).  This is the Memorandum Opinion and Order that the Court promised.

## RELEVANT FOURTH AMENDMENT LAW

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Fourth Amendment rights are enforceable against state actors through the Fourteenth Amendment's Due Process Clause.  See Mapp v. Ohio, 367 U.S. 643, 655 (1961)("Since the Fourth Amendment's right of privacy has been declared enforceable against the States through the Due Process Clause of the Fourteenth, it is enforceable against them by the same sanction of exclusion as used against the Federal Government."); United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1225 n.1 (10th Cir. 2008)("[T]he Fourth Amendment applies against state law

enforcement officials as incorporated through the Due Process Clause of the Fourteenth Amendment."). "Not all searches require a warrant. The hallmark of the Fourth Amendment is reasonableness." United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.). See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" (internal quotation marks omitted)(quoting Brigham the City v. Stuart, 547 U.S. 398, 403 (1978))). Cf. United States v. Sharpe, 470 U.S. 675, 691 (1985)(Marshall, J., concurring)(underlining that investigatory stops "do . . . not constitute the sort of arrest that the Constitution requires be made upon probable cause" because of their lower degree of intrusiveness); United States v. Brignoni-Ponce, 422 U.S. 873, 881-82 (1975)(discussing the importance of allowing officers with reasonable suspicion of criminal activity to conduct a brief investigative stop); Terry v. Ohio, 392 U.S. 1 (1968)(allowing officers who have "reason to believe" a person is armed and dangerous to stop the person, and to conduct a brief protective search for weapons). The Supreme Court has stated that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967)(footnote omitted).

1.    **The Fourth Amendment "Standing" Analysis.**

"The Tenth Circuit has referred to the test whether a particular search implicates a defendant's Fourth Amendment interests -- whether the search violates the defendant's reasonable privacy expectation -- as one of 'standing.'" Ysasi v. Brown, 3 F. Supp. 3d 1088, 1125 (D.N.M. 2014)(Browning, J.)(citing United States v. Creighton, 639 F.3d 1281, 1286 (10th Cir. 2011)("The Defendant has the burden of establishing . . . standing, or, in other words, a subjective expectation

of privacy in the [place searched] that society is prepared to recognize as reasonable."); United States v. Poe, 556 F.3d 1113, 1121 (10th Cir. 2009)("[A] defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search."); United States v. Shareef, 100 F.3d 1491, 1499 (10th Cir. 1996)("A Defendant has standing to challenge a search only if he or she has a reasonable expectation of privacy in the area being searched.")). Accordingly, the Court, following the Tenth Circuit's lead, has also referred to this reasonable-expectation-of-privacy test as one of standing. See, e.g., United States v. Harmon, 785 F. Supp. 2d at 1157 ("Standing requires the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'" (quoting United States v. Poe, 556 F.3d at 1121)). The Supreme Court's decisions suggest, however, that the "standing" test has now expressly been incorporated into the substantive Fourth Amendment search analysis. See United States v. Sweeney, No. 14-CR-0020, 2014 WL 2514926, at *2 (E.D. Wis. June 4, 2014)(Adelman, J.)("Once referred to as 'standing,' this requirement is actually part of substantive Fourth Amendment law.").

In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court disapproved of labeling the inquiry whether a search implicates a defendant's personal Fourth Amendment interests "as one of standing, rather than simply recognizing it as one involving the substantive question of whether or not the proponent of the motion to suppress had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge." 439 U.S. at 133. Dispensing with this label, the Supreme Court noted:

> Had we accepted petitioners' request to allow persons other than those whose own Fourth Amendment rights were violated by a challenged search and seizure to suppress evidence obtained in the course of such police activity, it would be appropriate to retain [the Jones v. United States, 362 U.S. 257 (1960),] use of

standing in Fourth Amendment analysis. Under petitioners' target theory, a court could determine that a defendant had standing to invoke the exclusionary rule without having to inquire into the substantive question of whether the challenged search or seizure violated the Fourth Amendment rights of that particular defendant. However, having rejected petitioners' target theory and reaffirmed the principle that the "rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure," *Simmons v. United States*, 390 U.S. [377, 389 (1968)], the question necessarily arises whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim. We can think of no decided cases of this Court that would have come out differently had we concluded, as we do now, that the type of standing requirement discussed in *Jones* and reaffirmed today is more properly subsumed under substantive Fourth Amendment doctrine. Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded. The inquiry under either approach is the same. But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing. The Court in *Jones* also may have been aware that there was a certain artificiality in analyzing this question in terms of standing because in at least three separate places in its opinion the Court placed that term within quotation marks.

Rakas v. Illinois, 439 U.S. at 138-39 (footnote omitted)(second alteration in original). The

Supreme Court emphasized:

> [N]othing we say here casts the least doubt on cases which recognize . . . as a general proposition, the issue of standing [generally.] . . . But this Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.

Rakas v. Illinois, 439 U.S. at 139-40 (citations omitted). In Minnesota v. Carter, 525 U.S. 83

(1998), the Supreme Court recognized that Rakas v. Illinois put an end to the practice of conducting

a Fourth Amendment standing analysis separate from the substantive Fourth Amendment search

analysis:

The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of "standing" doctrine, an analysis that this Court expressly rejected 20 years ago in *Rakas* . . . . Central to our analysis [in Rakas v. Illinois] was the idea that in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." [Rakas v. Illinois, 439 U.S. at 140.]

Minnesota v. Carter, 525 U.S. at 87-88 (citations omitted). The Supreme Court has, thus, noted that the analysis under either approach -- the substantive Fourth Amendment doctrine that the rights that the Amendment secures are personal versus the separate notion of "standing" -- is the same. Rakas v. Illinois, 439 U.S. at 139.

### 2.      Whether a Fourth Amendment Search Occurred.

A court cannot suppress evidence unless the search was a search for the Fourth Amendment's purposes. See Mapp v. Ohio, 367 U.S. at 654-55 (holding that "evidence obtained by searches and seizures in violation of the Constitution is" inadmissible). A Fourth Amendment search occurs either where the government, to obtain information, trespasses on a person's property or where the government violates a person's subjective expectation of privacy that society recognizes as reasonable to collect information. See United States v. Jones, 565 U.S. at 404-08. "[T]he *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." United States v. Jones, 565 U.S. at 409 (emphasis in original).

### a.      The Trespass-Based Analysis.

In Florida v. Jardines, the Supreme Court explained that the Fourth Amendment "establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the original meaning of the Fourth Amendment' has

'undoubtedly occurred.'" Florida v. Jardines, 569 U.S. at 5 (quoting United States v. Jones, 565 U.S. at 406 n.3). "[A]n actual trespass," however, "is neither necessary nor sufficient to establish a constitutional violation." United States v. Jones, 565 U.S. at 408 n.5 (emphasis omitted)(quoting United States v. Karo, 468 U.S. 705, 713 (1984)). In determining whether a search has occurred, "[t]respass alone does not qualify, but there must be conjoined with that . . . an attempt to find something or to obtain information." United States v. Jones, 565 U.S. at 408 n.5. The Supreme Court has also noted that "[p]hysically invasive inspection is simply more intrusive than purely visual inspection." Bond v. United States, 529 U.S. 334, 337 (2000). Moreover, the Supreme Court, in Florida v. Jardines, suggested that the trespass-based analysis applies only where the trespass occurs in one of the four places or things listed in the Fourth Amendment:

> The Fourth Amendment "indicates with some precision the places and things encompassed by its protections": persons, houses, papers, and effects. The Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to *Katz*) gather information in what we have called "open fields" -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text.

> But when it comes to the Fourth Amendment, the home is first among equals.

Florida v. Jardines, 569 U.S. at 6 (citations omitted).[5]

---

[5]The Honorable Elena Kagan, Associate Justice for the Supreme Court, filed a separate concurring opinion, in which the Honorable Ruth Ginsburg, Associate Justice for the Supreme Court, and the Honorable Sonia Sotomayor, Associate Justice for the Supreme Court, joined, adding "further thoughts, suggesting that a focus on Jardines' privacy interests would make 'an easy cas[e] easy' twice over," but "join[ing] the Court's opinion in full." 569 U.S. at 16 (Kagan, J., concurring)(first alteration in original). "The Court today treats this case under a property rubric; I write separately to note that I could just as happily have decided it by looking to Jardines' privacy interests." 569 U.S. at 13 (Kagan, J., concurring). Justice Kagan analogized the government's conduct in using a drug sniffing dog on Jardines' porch to a stranger coming to the front door, who "doesn't knock or say hello," but instead, peers through the windows "into your home's furthest

In <u>United States v. Alabi</u>, 943 F. Supp. 2d 1201 (D.N.M. 2013)(Browning, J.), <u>aff'd</u>, 597

F. App'x 991 (10th Cir. 2015), the Court analyzed whether the Secret Service's digital scan of

electronic information in the defendants' credit and debit cards' magnetic strips was a Fourth

Amendment search under a trespass-based analysis, concluding that it was not, because the Secret

Service properly possessed the credit and debit cards, and the additional act of scanning the cards

to read the virtual data contained on the strips did not involve a physical intrusion or physical

---

corners" with "super-high-powered binoculars," and, "[i]n just a couple of minutes, his uncommon behavior allows him to learn details of your life you disclose to no one." 569 U.S. at 12 (Kagan, J., concurring). This conduct, she posited, is a trespass which exceeds any implied license and is also an invasion of reasonable expectations of privacy; she argued that, like her analogy, the facts in <u>Florida v. Jardines</u> likewise involved a trespass and a violation of privacy expectations:

> That case is this case in every way that matters. Here, police officers came to Joelis Jardines' door with a super-sensitive instrument, which they deployed to detect things inside that they could not perceive unassisted. The equipment they used was animal, not mineral. But contra the dissent, see [569 U.S. at 16-17] (opinion of Alito, J.)(noting the ubiquity of dogs in American households), that is of no significance in determining whether a search occurred.

569 U.S. at 12 (Kagan, J., concurring). According to Justice Kagan, had she written the majority opinion based on the <u>Katz v. United States</u> reasonable-expectations-of-privacy search test,

> [a] decision along those lines would have looked . . . well, much like this one. It would have talked about "'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" [<u>Florida v. Jardines</u>, 569 U.S. at 6] (quoting <i>Silverman v. United States</i>, 365 U.S. 505, 511 . . . (1961)). It would have insisted on maintaining the "practical value" of that right by preventing police officers from standing in an adjacent space and "trawl[ing] for evidence with impunity." [<u>Florida v. Jardines</u>, 569 U.S.] at 1414. It would have explained that "'privacy expectations are most heightened'" in the home and the surrounding area. [<u>Florida v. Jardines</u>, 569 U.S. at 7] (quoting <i>California v. the Ciraolo</i>, 476 U.S. [at] 213 . . .). And it would have determined that police officers invade those shared expectations when they use trained canine assistants to reveal within the confines of a home what they could not otherwise have found there. <u>See</u> [<u>Florida v. Jardines</u>, 569 U.S. at 8-9], and n.2-3.

<u>Florida v. Jardines</u>, 569 U.S. at 13 (Kagan, J., concurring).

penetration of space.  <u>See</u> 943 F. Supp. 2d at 1264-65.  The Court noted that, "[e]ven if the Supreme Court were to extend the trespass-based analysis for Fourth Amendment searches to virtual invasions, the Secret Service's conduct scanning the thirty-one credit and debit cards still would not amount to a Fourth Amendment search," because the magnetic strip, as opposed to the credit or debit card separately, is not a constitutionally protected area.  943 F. Supp. 2d at 1267-68.

> When a law enforcement officer sees only the exterior of a credit or debit card, however, given that the financial institution which issues the card places the same information on the magnetic strip as embossed on the card's exterior, the only instances in which the information inside the credit or debit card is not information already seen by and known to the officer is when the information has been reencoded for unlawful purposes.  In these instances, not only does the person asserting his or her Fourth Amendment right not own or otherwise lawfully possess the information contained inside the card on the magnetic strip, but the person has stolen the information with the intent to use that information to steal further from the person whose information is on the magnetic strip.  Protecting this area from law enforcement search and seizure would thus not further the Fourth Amendment's express purpose of protecting "[t]he right of the people to be secure in *their* persons, houses, papers, and effects . . . ."  U.S. Const. amend IV.

<u>United States v. Alabi</u>, 943 F. Supp. 2d at 1273 (alteration in original).

### b. <u>**Katz v. United States'**</u> **Reasonable-Expectation-of-Privacy Test Remains Good Law.**

The Court has noted that, in light of the Supreme Court's recent decisions in <u>Florida v. Jardines</u> and <u>United States v. Jones</u>, both of which the Honorable Antonin Scalia, the late Associate Justice for the Supreme Court, wrote for the majority, and both of which analyze whether government conduct constituted a Fourth Amendment search using the trespass-based approach, "the question arises whether the *Katz v. United States* reasonable-expectation-of-privacy test is still good law."  <u>United States v. Alabi</u>, 943 F. Supp. 2d at 1242.  Justice Scalia has consistently criticized this "notoriously unhelpful test":

In my view, the only thing the past three decades have established about the *Katz* test (which has come to mean the test enunciated by Justice Harlan's separate concurrence in *Katz,* see *id.,* at 360 . . . ) is that, unsurprisingly, those "actual (subjective) expectation[s] of privacy" "that society is prepared to recognize as 'reasonable,'" *id.,* at 361 . . . , bear an uncanny resemblance to those expectations of privacy that this Court considers reasonable. When that self-indulgent test is employed (as the dissent would employ it here) to determine whether a "search or seizure" within the meaning of the Constitution has *occurred* (as opposed to whether that "search or seizure" is an "unreasonable" one), it has no plausible foundation in the text of the Fourth Amendment. That provision did not guarantee some generalized "right of privacy" and leave it to this Court to determine which particular manifestations of the value of privacy "society is prepared to recognize as 'reasonable.'" *Ibid.* Rather, it enumerated ("persons, houses, papers, and effects") the objects of privacy protection to which the *Constitution* would extend, leaving further expansion to the good judgment, not of this Court, but of the people through their representatives in the legislature.

Minnesota v. Carter, 525 U.S. at 97-98 (Scalia, J., concurring)(emphasis and alteration in original).

In both United States v. Jones and Florida v. Jardines, however, Justice Scalia never stated that the Supreme Court was substituting the trespass-based analysis for Katz v. United States' reasonable-expectation-of-privacy analysis. Rather, his majority opinions assert that the Katz v. United States reasonable-expectation-of-privacy analysis adds to the trespass-based analysis. See Florida v. Jardines, 569 U.S. at 11 ("The *Katz* reasonable-expectations test 'has been *added to*, not *substituted for*,' the traditional property-based understanding of the Fourth Amendment . . . ." (emphasis in original)(quoting United States v. Jones, 565 U.S. at 409)). The Court concluded in United States v. Alabi that, "as the Supreme Court now stands, [the Honorable Samuel Alito, Associate Justice for the Supreme Court; the Honorable Stephen Breyer, Associate Justice for the Supreme Court; the Honorable Elena Kagan, Associate Justice for the Supreme Court; the Honorable Ruth Ginsburg, Associate Justice for the Supreme Court; and the Honorable Sonia Sotomayor, Associate Justice for the Supreme Court,] still adhere to application of the *Katz v. United States*

reasonable-expectation-of-privacy Fourth Amendment analysis, at least as a possible approach alongside of the trespass-based approach." United States v. Alabi, 943 F. Supp. 2d at 1243.

In June, 2013, Justice Scalia dissented from the Supreme Court's decision in Maryland v. King, 569 U.S. 435 (2013), in which the Supreme Court held that "DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure." 569 U.S. at 465. Justice Scalia criticized the majority opinion for analogizing DNA testing to taking an arrestee's photograph by citing to Katz v. United States and pointing out that "we have never held that merely taking a person's photograph invades any recognized 'expectation of privacy.'" Maryland v. King, 569 U.S. at 477 (Scalia, J., dissenting). Justice Scalia also notes that a person's "privacy-related concerns" in his or her body are weighty:

> We are told that the "privacy-related concerns" in the search of a home "are weighty enough that the search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee." But why are the "privacy-related concerns" not also "weighty" when an intrusion into the *body* is at stake? (The Fourth Amendment lists "persons" *first* among the entities protected against unreasonable searches and seizures.).

Maryland v. King, 569 U.S. at 469 (Scalia, J., dissenting)(emphasis in original). Justice Scalia also suggested that the Founders would have shared these privacy-related concerns:

> Today's judgment will, to be sure, have the beneficial effect of solving more crimes; then again, so would the taking of DNA samples from anyone who flies on an airplane (surely the Transportation Security Administration needs to know the "identity" of the flying public), applies for a driver's license, or attends a public school. Perhaps the construction of such a genetic panopticon is wise. But I doubt that the proud men who wrote the charter of our liberties would have been so eager to open their mouths for royal inspection.

Maryland v. King, 569 U.S. at 482 (Scalia J., dissenting).

The Supreme Court's recent decision in Carpenter v. United States, 138 S. Ct. 2206 (2018), underscores that the "reasonable-expectation-of-privacy test has been *added to*, not *substituted for*,

the common-law trespassory test." United States v. Jones, 565 U.S. at 409. In Carpenter v. United States, the Honorable John Roberts, Chief Justice for the Supreme Court, writing for the majority, relied on the Katz v. United States test to determine that the United States violated the defendant's Fourth Amendment rights by obtaining his cell-site records without a warrant. See Carpenter v. United States, 138 S. Ct. at 2217-19. Chief Justice Roberts wrote that "what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected," Carpenter v. United States, 138 S. Ct. at 2217 (internal quotation marks omitted)(quoting Katz v. United States, 389 U.S. at 351-52), and that "[a] majority of this Court has already recognized that individuals have a reasonable expectation of privacy in the whole of their physical movements," 138 S. Ct. at 2217 (citing United States v. Jones, 565 U.S. at 430 (Alito, J., concurring in judgment); id. at 415 (Sotomayor, J., concurring)). Chief Justice Roberts concluded that "historical cell-site records present even greater privacy concerns than the GPS monitoring of a vehicle we considered in Jones" and allowing the government warrantless access to this information contravenes individuals' reasonable expectation of privacy in the whole of their physical movements. Carpenter v. United States, 138 S. Ct. at 2217-18. The Court, therefore, concludes that the Supreme Court still relies on a person's privacy expectation when determining whether a search is reasonable for Fourth Amendment purposes, although Justice Scalia would not have turned to the expectations prong until after he ran the facts through the trespass prong.

### c. Katz v. United States' Reasonable-Expectations-of-Privacy Analysis.

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." Rakas v. Illinois, 439 U.S. at 133-34 (internal quotation marks omitted)(quoting Alderman v. United States, 394 U.S. 165, 174 (1969)). "A district court cannot

suppress evidence unless the movant proves that a search implicates *personal* Fourth Amendment interests." United States v. Jones, 44 F.3d 860, 871 (10th Cir. 1995)(emphasis in original). "'[N]o interest legitimately protected by the Fourth Amendment' is implicated by governmental investigative activities unless there is an intrusion into a zone of privacy, into 'the security a man relies upon when he places himself or his property within a constitutionally protected area.'" United States v. Miller, 425 U.S. 435, 440 (1976)(quoting Hoffa v. United States, 385 U.S. 293, 301-02 (1966)). The Tenth Circuit has, thus, noted that "[a]n illegal search or seizure only harms those with legitimate expectations of privacy in the premises searched." United States v. Jones, 44 F.3d at 871 (citing United States v. Roper, 918 F.2d 885, 886-87 (10th Cir. 1990)). Thus, "[t]he proper inquiry" to determine whether a search implicates a defendant's Fourth Amendment interests still depends, after conducting a trespass-based analysis, on "whether the defendant had an expectation of privacy in the place searched and whether that expectation was objectively reasonable." Kerns v. Bd. of Comm'rs of Bernalillo Cty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.).

"Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." Illinois v. Caballes, 543 U.S. 405, 409 (2005)(quoting United States v. Jacobsen, 466 U.S. 109, 123 (1984)). The Supreme Court has, thus, recognized that, rather than determining whether law enforcement's conduct was a search, it sometimes proves easier to "assess . . . when a search is not a search." Kyllo v. United States, 533 U.S. 27, 32 (2001).

> In assessing when a search is not a search, we have applied somewhat in reverse the principle first enunciated in *Katz v. United States. Katz* involved eavesdropping by means of an electronic listening device placed on the outside of a telephone booth -- a location not within the catalog ("persons, houses, papers, and effects") that the Fourth Amendment protects against unreasonable searches. We held that the Fourth Amendment nonetheless protected Katz from the warrantless

- 36 -

eavesdropping because he "justifiably relied" upon the privacy of the telephone booth. As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.

Kyllo v. United States, 533 U.S. at 32-33 (citation omitted). The Supreme Court, thus, articulated the Katz v. United States rule -- which Wayne R. LaFave, professor at the University of Illinois College of Law, has noted is "somewhat inaccurately stated as the 'reasonable expectation of privacy' test," Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.1(b), at 435 (4th ed. 2004) -- which posits: "[A] Fourth Amendment search does *not* occur . . . unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'" Kyllo v. United States, 533 U.S. at 33 (emphasis and second alteration in original)(quoting California v. Ciraolo, 476 U.S. 207, 211 (1986)).

A "reasonable expectation of privacy" is "said to be an expectation 'that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" United States v. Jones, 565 U.S. at 408 (quoting Minnesota v. Carter, 525 U.S. at 88). See United States v. Harmon, 785 F. Supp. 2d at 1157 ("To decide whether a reasonable expectation of privacy existed, the court consider concepts of real or personal property law . . . ."). In analyzing whether an expectation of privacy is reasonable in the Fourth Amendment context based on property law, "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control." Rakas v. Illinois, 439 U.S. at 143 & n.12. Although ownership or lawful possession is not determinative under the Katz v. United States reasonable-expectation-of-privacy test, it is often a dispositive factor; because the Fourth Amendment provides a personal right, a defendant bears

the burden of demonstrating "that he gained possession [of the area searched] from the owner or someone with the authority to grant possession." United States v. Arango, 912 F.2d 441, 445 (10th Cir. 1990).

### i.    Subjective Expectation of Privacy.

A defendant maintains a subjective expectation of privacy when he or she "has shown that 'he sought to preserve something as private.'" Ysasi v. Brown, 3 F. Supp. 3d at 1132 (internal alterations omitted)(quoting Bond v. United States, 529 U.S. at 338). Thus, there is no reasonable expectation of privacy in otherwise private information disclosed to a third party. See United States v. Miller, 425 U.S. at 443. "[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." Katz v. United States, 389 U.S. at 351. The Supreme Court has noted:

> This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

United States v. Miller, 425 U.S. at 443.

The Supreme Court has recognized, however, that subjective expectations of privacy do not always coincide with the interests that the Fourth Amendment is universally thought to protect. In Smith v. Maryland, 442 U.S. 735 (1979), for instance, the Supreme Court identified situations in which it would not follow the subjective approach:

> Situations can be imagined, of course, in which Katz' two-pronged inquiry would provide an inadequate index of Fourth Amendment protection. For example, if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation or [sic] privacy regarding their homes, papers, and effects. Similarly, if a refugee from a totalitarian country,

unaware of this Nation's traditions, erroneously assumed that police were continuously monitoring his telephone conversations, a subjective expectation of privacy regarding the contents of his calls might be lacking as well. In such circumstances, where an individual's subjective expectations had been "conditioned" by influences alien to well-recognized Fourth Amendment freedoms, those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection was. In determining whether a "legitimate expectation of privacy" existed in such cases, a normative inquiry would be proper.

Smith v. Maryland, 442 U.S. at 740 n.5. In United States v. Jones, Justice Sotomayor commented that, given the reality of technology in the twenty-first century, it may no longer be sound to universally hold to the third-party disclosure rule to determine whether a subjective expectation of privacy exists:

> [I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties. This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks. People disclose the phone numbers that they dial or text to their cellular providers; the URLs [(Uniform Resource Locator)] that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers. Perhaps, as Justice Alito notes, some people may find the "tradeoff" of privacy for convenience "worthwhile," or come to accept this "diminution of privacy" as "inevitable," and perhaps not. I for one doubt that people would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year. But whatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment jurisprudence ceases to treat secrecy as a prerequisite for privacy. I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.

United States v. Jones, 565 U.S. at 417 (Sotomayor, J., concurring)(citations omitted). Most recently, in Carpenter v. United States, the Supreme Court recognized the third-party doctrine's application to "telephone numbers and bank records," but declined to extend it to cover cell-site location records. 138 S. Ct. at 2216-17. Chief Justice Roberts, writing for the majority, wrote:

> Given the unique nature of cell phone location records, the fact that the information is held by a third party does not by itself overcome the user's claim to Fourth Amendment protection. Whether the Government employs its own surveillance technology as in [United States v.] *Jones* or leverages the technology of a wireless carrier, we hold that an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through the CSLI[6].

Carpenter v. United States, 138 S. Ct. at 2217. The Court notes, however, that, regardless what the Supreme Court decides to do with social media on the internet, only the most ignorant or gullible think that what they post on the internet is or remains private. See United States v. Meregildo, 883 F. Supp. 2d 523, 526 (S.D.N.Y. 2012)(Pauley III, J.)(holding that a person posting to his Facebook profile had "no justifiable expectation that his 'friends' would keep his profile private").

### ii. Privacy Expectation That Society Is Prepared to Recognize as Reasonable.

Under the second step of Katz v. United States' reasonable-expectation-of-privacy approach, courts must determine "whether society is prepared to recognize that [subjective privacy] expectation as objectively reasonable." United States v. Ruiz, 664 F.3d 833, 838 (10th

---

[6]The Supreme Court uses "CSLI" as an abbreviation for "cell-site location information." See Carpenter v. United States, 138 S. Ct. at 2211. The Supreme Court explains:

> Cell phones continuously scan their environment looking for the best signal, which generally comes from the closest cell site. Most modern devices, such as smartphones, tap into the wireless network several times a minute whenever their signal is on, even if the owner is not using one of the phone's features. Each time the phone connects to a cell site, it generates a time-stamped record known as cell-site location information (CSLI). The precision of this information depends on the size of the geographic area covered by the cell site. The greater the concentration of cell sites, the smaller the coverage area.

Carpenter v. United States, 138 S. Ct. at 2211.

Cir. 2012)(internal quotation marks omitted)(quoting <u>United States v. Allen</u>, 235 F.3d 482, 489 (10th Cir. 2000)).  The Supreme Court has cautioned: "The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities."  <u>United States v. Jacobsen</u>, 466 U.S. at 122.  "Determining whether society would view the expectation as objectively reasonable turns on whether the government's intrusion infringes on a legitimate interest, based on the values that the Fourth Amendment protects." <u>California v. Ciraolo</u>, 476 U.S. at 212 (explaining that "[t]he test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity," but instead "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment" (alteration in original)(internal quotation marks omitted)(quoting <u>Oliver v. United States</u>, 466 U.S. 170, 182-83 (1984))).  This second factor of the <u>Katz v. United States</u> reasonable-expectation-of-privacy analysis developed from the attempt of the Honorable John Marshall Harlan's, late Associate Justice for the Supreme Court, "to give content to the word 'justifiably' in the majority's assertion that eavesdropping on Katz was a search because it 'violated the privacy upon which he justifiably relied while using the telephone booth.'"  LaFave, <u>supra</u>, at § 2.1(d), at 439 (quoting <u>Katz v. United States,</u> 389 U.S. at 353).  Thus, whether society will recognize a certain expectation of privacy does not turn on whether the hypothetical reasonable person would hold the same expectation of privacy, but rather on whether the expectation of privacy is justified or legitimate. See <u>Smith v. Maryland</u>, 442 U.S. at 739.  The Supreme Court has provided that, while no single factor determines legitimacy, whether society recognizes a privacy interest as reasonable is

determined based on our societal understanding regarding what deserves protection from government invasion:

> No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant. In assessing the degree to which a search infringes upon individual privacy, the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion.

Oliver v. United States, 466 U.S. at 177-78 (citations omitted).

The Supreme Court has held that "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." Illinois v. Caballes, 543 U.S. at 408 (quoting United States v. Jacobsen, 466 U.S. at 123). In United States v. Place, 462 U.S. 696 (1983), the Supreme Court held that the "canine sniff" of a drug-sniffing dog does "not constitute a 'search' within the meaning of the Fourth Amendment." 462 U.S. at 707. The case arose when law enforcement seized the luggage of an airline passenger and transported it to another location, where a drug-sniffing dog could sniff it. See 462 U.S. at 699. The drug-sniffing dog alerted the officers that drugs were in the luggage, the officers obtained a search warrant, and, upon opening the bags, the officers found over one-thousand grams of cocaine. See 462 U.S. at 699. While recognizing that a person has a reasonable expectation of privacy in the contents of his or her luggage, the Supreme Court held that the dog's sniff test was not a Fourth Amendment search and emphasized the unique nature of the investigative technique, which could identify only criminal activity:

> We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment. A "canine sniff" by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain

hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

In these respects, the canine sniff is *sui generis*. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here -- exposure of respondent's luggage, which was located in a public place, to a trained canine -- did not constitute a "search" within the meaning of the Fourth Amendment.

United States v. Place, 462 U.S. at 707 (citation omitted).

In United States v. Jacobsen, the Supreme Court extended this holding to the chemical field test of a white powdery substance to reveal that the substance was cocaine. See 466 U.S. at 122-24. A Federal Express employee and supervisor opened a damaged package, and exposed four zip-lock plastic bags containing six and one-half ounces of white powder. See 466 U.S. at 111. The Federal Express employees then called the Drug Enforcement Agency ("DEA") and repacked the contents in the original packaging before they provided the package to the DEA officers. See 466 U.S. at 111. When the agents arrived, the agents removed the exposed plastic bags from the broken package, opened each of the four bags, and field-tested the white powder, identifying the powder as cocaine. See 466 U.S. at 111-12. The Supreme Court first held that removal of the plastic bags from the tube and the agent's visual inspection were not Fourth Amendment searches:

[T]he removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search. It infringed no legitimate expectation of privacy and hence was not a "search" within the meaning of the Fourth Amendment.

United States v. Jacobsen, 466 U.S. at 120 (footnote omitted).  The Supreme Court noted: "The question remains whether the additional intrusion occasioned by the field test, which had not been conducted by the Federal Express agents and therefore exceeded the scope of the private search, was an unlawful 'search' or 'seizure' within the meaning of the Fourth Amendment."  466 U.S. at 122.  The Supreme Court, relying on United States v. Place, held that the additional digital scan of the white substance was not a Fourth Amendment search, because the test discloses only whether the substance is cocaine and "nothing [else] of special interest":

> The field test at issue could disclose only one fact previously unknown to the agent -- whether or not a suspicious white powder was cocaine.  It could tell him nothing more, not even whether the substance was sugar or talcum powder.  We must first determine whether this can be considered a "search" subject to the Fourth Amendment -- did it infringe an expectation of privacy that society is prepared to consider reasonable?

> . . . .

> A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy.  This conclusion is not dependent on the result of any particular test.  It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised.  But even if the results are negative -- merely disclosing that the substance is something other than cocaine -- such a result reveals nothing of special interest.  Congress has decided -- and there is no question about its power to do so -- to treat the interest in "privately" possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably "private" fact, compromises no legitimate privacy interest.

> . . . .

> Here, as in Place, the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment.

United States v. Jacobsen, 466 U.S. at 122-24 (footnote omitted).

Most recently, where a "dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation," the Supreme Court, again relying on United States v. Place and also on United States v. Jacobsen, held that "[a]ny intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement." Illinois v. Caballes, 543 U.S. at 409.[7] The Supreme Court reasoned that the dog sniff in Illinois v. Caballes fell squarely in line with the series of cases holding "that any interest in possessing contraband cannot be deemed 'legitimate,' and th[at], governmental conduct that *only* reveals the possession of contraband 'compromises no legitimate privacy interest.'" Illinois v. Caballes, 543 U.S. at 408 (emphasis in original)(quoting United States v. Jacobsen, 466 U.S. at 123). The Supreme Court explained: "This is because the expectation 'that certain facts will not come to the attention of the authorities' is not the same as an interest in 'privacy that society is prepared to consider reasonable.'" Illinois v. Caballes, 543 U.S. at 408-09 (quoting United States v. Jacobsen, 466 U.S. at 122). The Supreme Court in Illinois v. Caballes noted that its decision was consistent with Kyllo v. United States, as the thermal imaging device in Kyllo v. United States could detect lawful, "intimate details" in a home:

> This conclusion is entirely consistent with our recent decision that the use of a thermal-imaging device to detect the growth of marijuana in a home constituted an unlawful search. *Kyllo v. United States*, 533 U.S. 27 . . . (2001). Critical to that decision was the fact that the device was capable of detecting lawful activity -- in that case, intimate details in a home, such as "at what hour each night the lady of the house takes her daily sauna and bath." *Id.*, at 38 . . . The legitimate expectation that information about perfectly lawful activity will remain private is categorically

---

[7]The Honorable John Paul Stevens, former Associate Justice of the Supreme Court, penned the majority's opinion in Illinois v. Caballes. Out of the current Supreme Court Justices, the Honorable Clarence Thomas, Associate Justice of the Supreme Court, and Justice Breyer joined Justice Stevens' majority opinion, while Justice Ginsburg dissented. See 543 U.S. at 405.

distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car. A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.

Illinois v. Caballes, 543 U.S. at 409-10.

In United States v. Alabi, the defendants possessed thirty-one credit and debit cards, "many of them in their own names, several of which had information on the magnetic strips that related to persons other than the Defendants." 943 F. Supp. 2d at 1275. The Court reluctantly accepted the defendants' assertion that they "subjectively intended not to disclose this information to a third party -- *i.e.*, intended not to use the cards," 943 F. Supp. 2d at 1275, but determined that "a privacy expectation in the account information stored on credit and debit cards' magnetic strips -- separate and beyond the credit and debit cards themselves -- is not objectively reasonable," 943 F. Supp. 2d at 1280. The Court explained that the Secret Service's scan of the cards' magnetic strips "reveals only the same information revealed in a private search when the card is used as intended," and, further, that, even if the cards had never been used, the scan "discloses only information known by viewing the outside of the card, or information that the cards and account information are possessed unlawfully." 943 F. Supp. 2d at 1281. Noting the Supreme Court's decision in Rakas v. Illinois, in which the Supreme Court "reasoned that society is not prepared to recognize as reasonable an expectation of privacy in a burglar robbing a summer cabin during the offseason," the Court concluded that society would not recognize "as reasonable a privacy expectation which, at least in contemporary society, would benefit only criminals." United States v. Alabi, 943 F. Supp. 2d at 1287.

**3.     Search Warrants Require Probable Cause.**

"The Supreme Court requires that a magistrate judge be provided information sufficient to determine the existence of probable cause before he or she issues a warrant." United States v. Romero, 743 F. Supp. 2d at 1302 (citing Illinois v. Gates, 462 U.S. 213, 239 (1983)). Probable cause requires "more than mere suspicion but less evidence than is necessary to convict." United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980). To establish probable cause to justify a search of a home, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000). "Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched." United States v. Corral-Corral, 899 F.2d 927, 937 (10th Cir. 1990). The task of the magistrate judge issuing the search warrant

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(unpublished)(internal quotation marks omitted)(quoting Illinois v. Gates, 462 U.S. at 238). See United States v. Glover, 104 F.3d 1570, 1578 (10th Cir. 1997)(concluding that, in determining whether an affidavit supports a finding of probable cause, the court must review the affidavit as a whole and look to the totality of the information contained therein). In making his or her determination, the Magistrate Judge "may draw reasonable inferences from the material provided in the warrant application." United States v. Rowland, 145 F.3d at 1205.

"A reviewing court should accord great deference to a magistrate's determination of probable cause . . . ." United States v. Reed, 195 F. App'x at 822. The court's duty is "simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." Illinois v. Gates, 462 U.S. at 238-39 (alteration in original)(quoting Jones v. United States, 362 U.S. at 271). This deference is appropriate to further the Fourth Amendment's strong preference for warrants. See Massachusetts v. Upton, 466 U.S. 727, 733 (1984); Aguilar v. Texas, 378 U.S. 108, 110-11 (1964)("An evaluation of the constitutionality of a search warrant should begin with the rule 'that the informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried action of officers . . . .'" (quoting United States v. Lefkowitz, 285 U.S. 452, 464 (1932)). Because of the strong preference for warrants, "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." United States v. Ventresca, 380 U.S. 102, 106 (1965).

"The deference accorded a magistrate judge's probable cause determination, however, is not boundless." United States v. Alabi, 943 F. Supp. 2d at 1253-54 (citing United States v. Leon, 468 U.S. 897, 914 (1984)). "The court should not defer to a magistrate judge's probable-cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause." United States v. Sedillo, 297 F. Supp. 3d 1155, 1180 (D.N.M. 2017)(Browning, J.)(citing United States v. Danhauer, 229 F.3d at 1006). Specifically, the court should not defer to a Magistrate Judge's "probable cause determination if it is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances." United States v. Reed, 195 F. App'x at 822 (citing United States v.

Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. at 734; Illinois v. Gates, 462 U.S. at 239).

## RELEVANT LAW ON THE EXCLUSIONARY RULE

When evidence is obtained in violation of a person's rights under the Fourth or Fifth Amendments to the Constitution of the United States, the government will generally be prohibited from using that evidence in a criminal prosecution against that person. See Sanchez-Llamas v. Oregon, 548 U.S. 331, 348 (2006)("We have applied the exclusionary rule primarily to deter constitutional violations. In particular, we have ruled that the Constitution requires the exclusion of evidence obtained by certain violations of the Fourth Amendment, and confessions exacted by police in violation of the right against compelled self-incrimination or due process." (citations omitted)); United States v. Calandra, 414 U.S. at 347 ("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure."). "For the exclusionary rule to apply, the defendant must show, by a preponderance of the evidence: a constitutional violation, and a causal nexus between the violation and the evidence sought to be excluded." United States v. Villaba, No. CR 13-0664, 2013 WL 4782206, at *27 (D.N.M. Aug. 21, 2013)(Browning, J.)(citing United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006)). Once the defendant makes this showing, if the prosecutor still desires to proffer the challenged evidence, the burden shifts to the prosecution to establish that an exception to the exclusionary rule applies. See United States v. Torres-Castro, 470 F.3d at 999.[8]

---

[8]The Court has previously discussed the exclusionary rule in conjunction with the caselaw that restricts 42 U.S.C. § 1983 claims:

1.      **The Good-Faith Exception.**

Recognizing that the "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations," the Supreme Court has held that evidence will not be excluded where the officer who obtained the evidence -- through an unlawful search or seizure -- acted in good faith.

---

It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving . . . . These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives). In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering. See 547 U.S. at 596-97. Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress. It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights. It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs of Bernalillo Cty., 888 F. Supp. 2d at 1224 n.36.

United States v. Davis, 564 U.S. 229, 236-37 (2011).  To determine whether the good-faith exception applies, courts must balance the deterrent effect of excluding the evidence against "the 'substantial social costs' generated by the rule."  United States v. Davis, 564 U.S. at 237 (quoting United States v. Leon, 468 U.S. at 907).  The Supreme Court has explained that "[t]he basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue."  United States v. Davis, 564 U.S. at 238 (second alteration in original)(quoting Herring v. United States, 555 U.S. 135, 143 (2009)).  Consequently, "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs."  United States v. Davis, 564 U.S. at 238 (quoting Herring v. United States, 555 U.S. at 144).  By contrast, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way."  United States v. Davis, 564 U.S. at 238 (citations and internal quotation marks omitted).

### a.    Warrants Based on Illegally Obtained Information.

"When a search is conducted pursuant to a warrant that is based on illegally obtained information, a court is not to blindly apply the good-faith exception."  United States v. Alabi, 943 F. Supp. 2d at 1260.  "Instead, the court is to consider the warrant with the illegally obtained information excluded and determine, based on the remaining information, whether probable cause nevertheless existed."  United States v. Alabi, 943 F. Supp. 2d at 1260.  If the remaining content of the warrant affidavit establishes probable cause, the search pursuant to that warrant was appropriate, and the evidence need not be excluded:

> When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information. "An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid." *United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990).

United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005)(citation omitted). See United States v. Cusumano, 83 F.3d 1247, 1250 (10th Cir. 1996)("In our review, we may disregard allegedly tainted material in the affidavit and ask whether sufficient facts remain to establish probable cause."). "The apparent rationale for this rule is that one officer cannot execute a warrant 'in good faith' if it contains information that he or a fellow officer obtained illegally." United States v. Alabi, 943 F. Supp. 2d at 1260 (quoting United States v. Herrera, 444 F.3d 1238, 1249 (10th Cir. 2006)).

**b.     United States v. Leon.**

In United States v. Leon, the Supreme Court faced the question whether to apply the good-faith exception when a police officer mistakenly thought probable cause supported a warrant from which he obtained evidence. See 468 U.S. at 905. The Supreme Court noted that excluding this evidence would not deter police misconduct. See 468 U.S. at 918-19. The officer had taken all of the necessary steps to comply with the Fourth Amendment and reasonably thought his warrant, and, thus, his search, was valid. See 468 U.S. at 918-19. The Supreme Court explained that, when a warrant is issued on less than probable cause, the person whose conduct the law wishes to deter is the issuing judge and that excluding the evidence would not have a significantly deterrent effect on judicial conduct. See 468 U.S. at 916-17. The Supreme Court, thus, concluded that a court need not suppress evidence seized pursuant to a facially valid warrant which later turns out to lack

probable cause, as long as police were acting in good-faith reliance on that warrant. See 468 U.S. at 922-23.

"The Tenth Circuit therefore now applies the rule that, in cases where the police obtained a warrant but the affidavit supporting the warrant does not establish probable cause, suppression of the evidence found is generally not warranted, so long as the officers relied in good faith on the warrant." United States v. Martinez, 696 F. Supp. 2d at 1244 (citing United States v. Tuter, 240 F.3d 1292, 1300 (10th Cir. 2001); United States v. Danhauer, 229 F.3d at 1007).

> "[T]he suppression of evidence obtained pursuant to a warrant should be ordered . . . only in those unusual cases in which exclusion will further the purposes of the exclusionary rule," [United States v. Leon, 468 U.S.] at 918 . . . "Where an officer acting with objective good faith obtains a search warrant from a detached and neutral magistrate and the executing officers act within its scope, there is nothing to deter." *United States v. Nolan*, 199 F.3d 1180, 1184 (10th Cir. 1999).

United States v. Tuter, 240 F.3d at 1298-99. Furthermore, the Tenth Circuit has explained that, "[u]nder *Leon*, we presume good-faith when an officer acts pursuant to a warrant unless one of 'four contexts' appl[ies]." United States v. Barajas, 710 F.3d 1102, 1110 (10th Cir. 2013).

> First, evidence should be suppressed if the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his "reckless disregard of the truth." [United States v. Leon, 468 U.S.] at 923 . . . . Second, the exception does not apply when the "issuing magistrate wholly abandon[s her] judicial role." *Id.* Third, the good-faith exception does not apply when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* (quotation omitted). Fourth, the exception does not apply when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid. *See id.*

United States v. Danhauer, 229 F.3d at 1007 (quoting United States v. Leon, 468 U.S. at 922-23).

See United States v. Perrine, 518 F.3d 1196, 1206-07 (10th Cir. 2008). "If any of these situations

is present, the good-faith exception should not be applied, and the evidence should be excluded."
United States v. Romero, 743 F. Supp. 2d at 1316.

### c. Herring v. United States.

In Herring v. United States, officers arrested Herring pursuant to an arrest warrant listed in the Dale County, Alabama, warrant database. See 555 U.S. at 137. In the search incident to that arrest, officers found drugs and a gun on Herring's person. See 555 U.S. at 137. Herring was then indicted on federal gun- and drug-possession charges. See 555 U.S. at 138. It turned out, however, that the warrant under which the officers arrested Herring had been recalled, but the database had not been updated to reflect that recall. See 555 U.S. at 138. Asserting that the evidence found during the search was fruit of an unlawful arrest, Herring sought to suppress it. See 555 U.S. at 138. The district court denied Herring's motion to suppress, and the United States Court of Appeals for the Eleventh Circuit affirmed. See 555 U.S. at 138.

The Supreme Court affirmed the Eleventh Circuit's affirmation of the district court's denial of Herring's motion to suppress, based primarily on the good-faith exception to the exclusionary rule. See 555 U.S. at 140-46. The Supreme Court agreed with the Eleventh Circuit that, although the police's failure to update the warrant database to reflect that Herring's warrant was withdrawn was negligent, it was not reckless or deliberate. See 555 U.S. at 140. The Supreme Court reiterated its holding in United States v. Leon: "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." Herring v. United States, 555 U.S. at 142 (quoting United States v. Leon, 468 U.S. at 922). Tracing the history of cases applying and declining to apply the exclusionary rule, the Supreme Court distilled a general principle: "To

trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring v. United States, 555 U.S. at 144. The Supreme Court further explained that "evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional." Herring v. United States, 555 U.S. at 143 (internal quotation marks omitted)(quoting Illinois v. Krull, 480 U.S. 340, 348-49 (1987)). As long as the "police have [not] been shown to be reckless in maintaining [the] warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests," exclusion of evidence is not warranted when the arrest was made on objectively reasonable reliance on a warrant that had been subsequently recalled. Herring v. United States, 555 U.S. at 146.

### d. Davis v. United States.

In Davis v. United States, the Supreme Court confronted the question whether to apply the exclusionary rule when police conduct a search in objectively reasonable reliance on binding judicial precedent. See 564 U.S. at 239. At the time of the officer's search, the Supreme Court had not yet decided Arizona v. Gant, 556 U.S. 332 (2009) -- which held that the Fourth Amendment requires officers to demonstrate a continuing threat to their safety posed by the arrestee or a need to preserve evidence related to the crime of the arrest to justify a warrantless vehicular search incident to arrest. See Arizona v. Gant, 556 U.S. at 341-48. The Eleventh Circuit had interpreted the Supreme Court's decision in New York v. Belton, 453 U.S. 454 (1981), as establishing a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest. See United States v. Gonzalez, 71 F.3d 819, 825 (11th Cir. 1996).

Although the officers' search incident to the defendant's arrest "was in strict compliance with then-binding Circuit law and was not culpable in any way," it was unconstitutional under <u>Arizona v. Gant</u>. <u>United States v. Davis</u>, 564 U.S. at 239-40.

The Supreme Court determined that the "acknowledged absence of police culpability dooms [the defendant's] claim." <u>United States v. Davis</u>, 564 U.S. at 240. The Supreme Court explained that "[p]olice practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield meaningful deterrence, and culpable enough to be worth the price paid by the justice system." <u>United States v. Davis</u>, 564 U.S. at 240 (citation and internal quotation marks omitted). The Supreme Court stated: "The conduct of the officers here was neither of these things. The officers who conducted the search did not violate [the defendant's] Fourth Amendment rights deliberately, recklessly, or with gross negligence. Nor does this case involve any recurring or systemic negligence on the part of law enforcement." <u>United States v. Davis</u>, 564 U.S. at 240 (citation and internal quotation marks omitted). The Supreme Court concluded that, "[u]nless the exclusionary rule is to become a strict-liability regime, it can have no application in this case." <u>United States v. Davis</u>, 564 U.S. at 240.

## 2. **The Inevitable-Discovery Exception.**

Under the inevitable-discovery exception, "illegally obtained evidence may be admitted if it 'ultimately or inevitably would have been discovered by lawful means.'" <u>United States v. Christy</u>, 739 F.3d 534, 540 (10th Cir. 2014)(quoting <u>Nix v. Williams</u>, 467 U.S. 431, 444 (1984)). "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation." <u>United States v. Cunningham</u>, 413 F.3d 1199, 1203 (10th Cir. 2005). In <u>United States v. Owens</u>, 782 F.2d

146 (10th Cir. 1986), the Tenth Circuit noted that, for the inevitable-discovery exception to apply, there must be a "lawful police investigation [that] inevitably would have discovered" the evidence in question. 782 F.2d at 152. Relying on this statement from United States v. Owens, the Court stated in United States v. Christy, 810 F. Supp. 2d 1219 (D.N.M. 2011)(Browning, J.), aff'd, 739 F.3d 534 (10th Cir. 2014), that the inevitable-discovery exception "permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it." 810 F. Supp. 2d 1274 (citations and internal quotation marks omitted). On appeal, however, the Tenth Circuit clarified that the inevitable-discovery exception does not require an independent investigation that would have discovered the evidence in question. See United States v. Christy, 739 F.3d at 540. The Tenth Circuit explained:

> In Cunningham and [United States v. Souza, 223 F.3d 1197 (10th Cir. 2000,] we applied inevitable discovery to situations like the one here -- where there was "one line of investigation that would have led inevitably to the obtaining of a search warrant by independent lawful means but was halted prematurely by a search subsequently contended to be illegal." Cunningham, 413 F.3d at 1204 n.1. In Cunningham, police searched the defendant's home after getting his consent. Id. at 1202. The defendant later contested the search, claiming his consent was coerced. Id. We held that even if the search was illegal, the evidence was admissible because the officers "would have obtained a search warrant" if the search had not occurred. Id. at 1205. In Souza, police illegally opened a UPS package that contained drugs. 223 F.3d at 1200, 1202. We held the evidence admissible under inevitable discovery because the officers "would have obtained a warrant" had the illegal search not occurred. Id. at 1206. Thus, our case law does not require a second investigation when the first (and only) investigation would inevitably have discovered the contested evidence by lawful means.
>
> . . . .
>
> Thus, lest there be any doubt, we reaffirm the notion that inevitable discovery requires only that the lawful means of discovery be "independent of the constitutional violation," [United States v.] Larsen, 127 F.3d [984,] 987 [(10th Cir. 1997)], and conclude that a second investigation is not required.

United States v. Christy, 739 F.3d at 540-41.

In United States v. Souza, the Tenth Circuit "set forth the standard for considering whether the inevitable discovery doctrine applies to a warrantless search," United States v. Cunningham, 413 F.3d at 1203, when "there is no exception to the warrant requirement that could serve as a basis for the inevitable discovery exception," United States v. Souza, 223 F.3d at 1203. The Tenth Circuit stated that "a court may apply the inevitable discovery exception only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means." United States v. Souza, 223 F.3d at 1205. The Tenth Circuit adopted four factors to determine "how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to a warrant":

> 1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search"; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."

United States v. Souza, 223 F.3d at 1204 (citations omitted)(quoting United States v. Cabassa, 62 F.3d 470, 473-74, 473 n.2 (2d Cir. 1995)). Applying the first factor, the Tenth Circuit stated:

> [T]he prerequisite to a consideration of the inevitable discovery exception in these cases, steps taken to obtain a warrant prior to the unlawful search, is present in this case. Special Agent Rowden took steps to alert his office that he would be coming back to prepare a warrant for the package and made sure that the affidavit form would be ready when he got back to his office. Also, the package was specifically placed on the floor behind Detective Sloan for the purpose of obtaining a warrant.

United States v. Souza, 223 F.3d at 1205. Regarding the second factor, the Tenth Circuit stated:

> [A]t the time the illegal search occurred, probable cause to believe the package contained contraband was extremely strong. The package itself contained several suspicious characteristics, including all of the openings on the box being heavily taped, the box having been sent through third party shipping, the sender having only used a first name, and the box being solid so that no side of it could be compressed.

> Moreover, the box was alerted to by a certified narcotics dog, which is itself sufficient to create probable cause.

United States v. Souza, 223 F.3d at 1205-06. The Tenth Circuit noted that a sergeant eventually obtained a search warrant. See United States v. Souza, 223 F.3d at 1206. Regarding the third factor, the Tenth Circuit stated that, unlike "*Cabassa*, there is no question . . . concerning the inevitability of discovery of the evidence if the police had obtained a search warrant because the package was secured by the officers and there was no chance that it would not still be there when the warrant actually was issued." United States v. Souza, 223 F.3d at 1206. The Tenth Circuit did not reach the fourth factor, but concluded that, although it was

> very reluctant to apply the inevitable discovery exception in situations where the government fails to obtain a search warrant and no exception to the warrant requirement exists, in this case the inevitability of discovery of the evidence convince[d] [it] that [the case before it was] one of those occasions when the doctrine should apply.

United States v. Souza, 223 F.3d at 1206.

In United States v. Owens, the Tenth Circuit emphasized the "danger of admitting unlawfully obtained evidence on the strength of some judge's speculation that it would have been discovered legally anyway." 782 F.2d at 152-53 (internal quotation marks omitted)(quoting United States v. Romero, 692 F.2d 699, 704 (10th Cir. 1982)). The Tenth Circuit considered whether contraband seized without a warrant could still be admitted under the inevitable-discovery doctrine. See United States v. Owens, 782 F.2d at 152-53. Rejecting the United States' position that the motel maids' routine cleaning of the defendant's room for the next occupant would have revealed the contraband and that, therefore, discovery of the evidence was inevitable, the Tenth Circuit concluded:

Several factors suggest that motel employees performing routine cleaning may not have inevitably discovered the cocaine. First, if the [motel]'s staff had cleared [the defendant's] room, they would not necessarily have opened and searched all his luggage and closed containers. In fact, such an intrusion would have been a significant invasion of his privacy. Second, even if the room had been cleared and the white powder inside the closed bag had been discovered by the motel staff, the lack of any police involvement in routine room cleanings suggests that police discovery of the evidence would not have been inevitable. The evidence certainly does not demonstrate that the [motel]'s staff would necessarily have recognized the powder as cocaine or have called the police if they had so recognized it. Finally, absent the unlawful search, [the defendant] might have posted bail on the charge of receiving stolen property and could have returned to his motel room before either the cleaning staff or the police discovered the contraband. Alternatively, a friend could have returned to claim the closed bag.

782 F.2d at 153. "*United States v. Owens* suggests that courts should be realistic, if not skeptical, when assessing the probability that law-enforcement officers would inevitably have uncovered the challenged evidence through an independent investigation." United States v. Martinez, 696 F. Supp. 2d at 1244.

In United States v. Cunningham, the Tenth Circuit "appl[ied] the inevitable discovery doctrine . . . because [it was] convinced that without Mr. Cunningham's disputed consent, the warrant to search his house would have been issued and the incriminating evidence would have been discovered." 413 F.3d at 1205. The Tenth Circuit, in addressing the first factor -- the extent to which the warrant process had been completed at the time those seeking the warrant learn of the search -- stated:

Here, the officers took substantial steps to obtain a warrant before the contested search occurred. The record demonstrates that they had focused their investigation on 1175 and 1179 East 76th Terrace, and had drafted an affidavit to support a search warrant for one of these homes. As a result of their conversation with the [assistant United States attorney], the officers decided that further surveillance on the two homes was necessary before they specifically selected one to search, and they proceeded to conduct that surveillance immediately. The officers' actions clearly indicate they took steps to obtain a search warrant and that they intended to obtain the warrant for either 1175 or 1179 East 76th Terrace as soon as possible.

413 F.3d at 1204.  Regarding the second factor -- the strength of the showing of probable cause at the time the search occurred -- the Tenth Circuit stated:

> The officers also possessed strong probable cause for their search of 1179 East 76th Terrace by the time Mr. Cunningham arrived at the home.  Prior to that time, they had acquired background information about the alleged check-writing ring, narrowed their investigation to one residential block, and focused on the two homes sharing a common driveway.  The officers' surveillance had uncovered the following additional information: a red car containing two individuals identified earlier in the investigation arrived, parked briefly, and then pulled out from behind 1179 East 76th Terrace; a black pickup truck previously observed in the investigation was stopped containing Mr. Cunningham, who said that he lived at 1179 East 76th Terrace; the residents of 1175 East 76th Terrace told officers that the home next door had been receiving all of the traffic that evening, and the officers ruled out 1175 East 76th Terrace as the location visited by the alleged check supplier; and a gray Blazer previously observed in the investigation was seen parked by 1179 East 76th Terrace.  The government thus had sufficient probable cause for a search of 1179 East 76th Terrace at the time of Mr. Cunningham's disputed consent to search his home.

United States v. Cunningham, 413 F.3d at 1204-05.  Regarding the third factor -- whether a warrant ultimately was obtained, albeit after the illegal entry -- the Tenth Circuit stated: "Moreover, the officers ultimately did obtain a warrant, albeit based in part on information retrieved from inside Mr. Cunningham's home."  413 F.3d at 1205.  Regarding the fourth factor -- evidence that the officers "jumped the gun," because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Tenth Circuit stated:

> There is also no evidence the officers "jumped the gun" due to a lack of confidence about probable cause and out of a desire to force the issue.  [United States v. Souza, 223 F.3d] at 1204.  Instead, the record indicates that the search occurred at the time it did because of the coincidental arrival of Mrs. Cunningham.  Her presence on the scene led to a series of events that culminated in her son's release from jail, his return home, and his consent to search.  As a result, we are satisfied the government has demonstrated that, as in Souza, but for Mrs. Cunningham's arrival at 1179 East 76th Terrace on the evening of the search, the officers would have obtained a search warrant and the evidence in question would have been found.  Id. at 1205.

United States v. Cunningham, 413 F.3d at 1205 (citations omitted). The Tenth Circuit, therefore, applied the inevitable-discovery doctrine. See 413 F.3d at 1205.

In United States v. Christy, the Court applied the four United States v. Souza factors and determined that the inevitable-discovery exception applied. See 810 F. Supp. 2d at 1275-79. Regarding the first factor -- the extent to which the warrant process had been completed at the time those seeking the warrant learn of the search -- the Court stated: "The deputies did not take any steps to obtain a warrant before entering Christy's residence. The United States concedes that they did not attempt to obtain a warrant before entering Christy's residence. . . . This factor thus weighs against applying the inevitable discovery exception." 810 F. Supp. 2d at 1275 (citations omitted). As to the second factor -- the strength of the showing of probable cause at the time the search occurred -- the Court concluded:

> The Court finds that Carvo had strong probable cause that Christy committed crimes. At the time of the search, Carvo believed he had probable cause for the California crime of unlawful sexual intercourse, because Christy and K.Y. exchanged naked pictures through electronic mail transmissions over the internet and then arranged a meeting in the middle of the night for K.Y. to run away with Christy.
>
> . . . .
>
> Because Carvo knew that K.Y. and Christy were exchanging naked pictures, "the belief that there was a sexual relationship or sexual interest between the two was reasonable." These circumstances are sufficient to form "a reasonable ground for belief of [Christy's] guilt," for the California crime of unlawful sexual intercourse. Maryland v. Pringle, 540 U.S. 366, 371 . . . (2003)(citation omitted), for the California crime of unlawful sexual intercourse.
>
> Carvo also had strong probable cause for the federal crime of coercion or enticement. Carvo believed that he had probable cause for the federal crime of enticement or coercion, because of Christy's and K.Y.'s communications through the internet and electronic mail transmissions, because Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., which showed her breasts, and

because cellular telephone evidence shows that Christy traveled across state lines to bring K.Y. to New Mexico.

. . . .

Because Carvo knew that Christy and K.Y. communicated through electronic mail transmissions, that Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., because evidence showed that Christy traveled across state lines with K.Y., and because Carvo had strong probable cause that Christy committed the California crime of unlawful sexual intercourse, Carvo had "a reasonable ground for belief of [Christy's] guilt," Maryland v. Pringle, 540 U.S. 366, 371 . . . (2003)(citation omitted), for the federal crime of coercion or enticement. Because Carvo had strong probable cause for the California crime of unlawful sexual intercourse and for the federal crime of enticement or coercion, this factor weighs in favor of application of the inevitable discovery doctrine.

United States v. Christy, 810 F. Supp. 2d at 1276-78 (brackets in original)(citations to record and

footnote omitted).  Regarding the third factor,  -- whether a warrant ultimately was obtained, albeit

after the illegal entry -- the Court held:

> The deputies "ultimately did obtain a warrant, albeit based in part on information retrieved" from Littlefield's actions of peering through a crack in the blinds in Christy's window, and from the deputies' entry into Christy's residence and subsequent interview of Christy.  *United States v. Cunningham*, 413 F.3d at 1205.  Although portions of the affidavits supporting the warrants were based on information the Court has found illegally obtained, the affidavits also included information from the California investigation.  Although the Tenth Circuit appears to rely on illegally obtained information in its inevitable discovery analysis, the Court does not believe that it can do so.  Carvo had strong probable cause that Christy committed California and federal crimes, and Carvo's probable cause was based on his investigation, and not on any information he learned from the BCSO or from the Albuquerque FBI.  Because Carvo had strong probable cause for a California crime and a federal crime, based on information that he learned in his investigation, and not based on information he learned from the BCSO or from the Albuquerque FBI, Carvo would have obtained search warrants that were not based on illegally obtained information.  Based upon Carvo's belief that he had probable cause for both violations of California state law and violations of federal law, he would "have asked [BCSO] and/or -- either one -- the FBI to obtain a search warrant for [Christy's] Albuquerque residence, vehicle, computers, cell phones, things of that nature."  If the BCSO or Albuquerque FBI were not able to obtain a search warrant for these locations, Carvo would have written a federal search warrant himself and come to the District of New Mexico to seek the warrant with himself

as the affiant. Carvo is cross designated to acquire both state and federal search warrants. This factor thus weighs in favor of application of the inevitable-discovery doctrine.

United States v. Christy, 810 F. Supp. at 1278-79 (second and third alterations in original)(citations omitted). As to the fourth factor -- the existence of evidence that the officers jumped the gun, because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Court determined:

> There is "no evidence that the officers 'jumped the gun' due to a lack of confidence about probable cause and out of a desire to force the issue." *United States v. Cunningham*, 413 F.3d at 1205. The record indicates that the search occurred when it did because the deputies believed that they had exigent circumstances to enter Christy's residence. This factor thus weighs in favor of application of the inevitable discovery doctrine.

United States v. Christy, 810 F. Supp. 2d at 1279. Consequently, the Court applied the inevitable-discovery doctrine. See 810 F. Supp. 2d at 1279.

On appeal, the Tenth Circuit affirmed the Court's decision. See 739 F.3d at 539-44. Addressing the United States v. Souza factors, the Tenth Circuit noted that the defendant challenged the Court's ruling only on factors two and four -- the strength of the probable cause showing when the unlawful search occurred and whether the officers "'jumped the gun' to sidestep the warrant requirement." United States v. Christy, 739 F.3d at 541 (quoting Opening Brief of Appellant at 24, United States v. Christy, 739 F.3d 534 (10th Cir. 2014)(No. 12-2127)). Regarding the second factor -- the strength of the showing of probable cause at the time the unlawful search occurred -- the Tenth Circuit stated:

> The district court found that Officer Carvo knew that K.Y. was a minor, there was a large age difference between her and Mr. Christy, the two exchanged sexually explicit pictures, and that Mr. Christy traveled across state lines with K.Y. Given those factual findings, it is a reasonable inference that a sexual relationship existed between Mr. Christy and K.Y. Officer Carvo also knew that K.Y. was

potentially suicidal, had left her depression medication behind, and ran away from home with Mr. Christy. Based on that knowledge, Officer Carvo's belief that K.Y. was at risk for sexual victimization and assault was reasonable. Thus, Officer Carvo had reasonable grounds to believe that Mr. Christy engaged in sexual activity in violation of California law and coerced or enticed K.Y. to travel across state lines to engage in criminal sexual activity in violation of federal law. The district court was correct in weighing this factor in favor of applying inevitable discovery.

United States v. Christy, 739 F.3d at 542 (citations omitted). Analyzing the fourth factor -- evidence that the officers jumped the gun because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Tenth Circuit explained:

Mr. Christy argues that the deputies "jumped the gun" by forcing entry into his home due to their lack of confidence about probable cause. Yet as the district court found, no evidence supports the theory that the deputies forced entry for that reason. Instead, the deputies forced entry because they believed K.Y. was in danger. Mr. Christy argues that the search was not in fact justified by exigent circumstances and points to the district court's conclusion that it was not. But that is beside the point. The record fully supports the reasonableness of the deputies' assessment of danger. The district court was correct in weighing this factor in favor of the government.

United States v. Christy, 739 F.3d at 543 (citations omitted). The Tenth Circuit concluded, therefore, that the Court properly applied the United States v. Souza factors. See 739 F.3d at 542.

### 3.    The Independent-Source Exception.

If the information found during an "unconstitutional search . . . [is] used to obtain [a] search warrant," then "evidence seized during the later search conducted pursuant to [the] warrant would be inadmissible as fruit of the poisonous tree." United States v. Hatfield, 333 F.3d at 1194 (citing Murray v. United States, 487 U.S. 533, 542-44 (1988)). When determining whether evidence is fruit of the poisonous tree, a court is to consider whether the evidence was "come at by exploitation of [the initial] illegality or instead by means sufficiently distinguishable to be

purged of the primary taint." <u>Segura v. United States</u>, 468 U.S. 796, 804-05 (1984)(internal quotation marks omitted)(alteration in original)(quoting <u>Wong Sun v. United States</u>, 371 U.S. at 488). Under the independent-source doctrine, evidence that is obtained based upon information unrelated to an unlawful search is not fruit of the poisonous tree. <u>See</u> <u>Segura v. United States</u>, 468 U.S. at 799 (citing <u>Silverthorne Lumber Co. v. United States</u>, 251 U.S. 385 (1920)). Evidence therefore need not be excluded under the fruit-of-the-poisonous-tree doctrine if there is an independent source for discovery of the challenged evidence. <u>See</u> <u>Segura v. United States</u>, 468 U.S.at 805. "The government bears the burden of showing, by a preponderance of the evidence, that there is truly an independent source for the challenged evidence." <u>United States v. Forbes</u>, 528 F.3d 1273, 1279 (10th Cir. 2008)(citing <u>United States v. Lin Lyn Trading, Ltd.</u>, 149 F.3d 1112, 1116 (10th Cir. 1998)).

In <u>Segura v. United States</u> and <u>Murray v. United States</u>, the Supreme Court considered the operation of the independent-source doctrine in situations where a search warrant is obtained subsequent to an unlawful search. In <u>Segura v. United States</u>, police unlawfully entered an apartment and spotted drug-trafficking paraphernalia in plain view. <u>See</u> 468 U.S. at 801. A warrant was later obtained, based upon information that the police had known before the entry and executed at the apartment. <u>See</u> 468 U.S. at 801. In the meantime, police stayed in the apartment to preserve the scene. <u>See</u> 468 U.S. at 801. Pursuant to the warrant, they later seized the paraphernalia, as well as cocaine, cash, ammunition, and records of drug transactions, none of which had been observed during the unlawful search. <u>See</u> 468 U.S. at 801. Before the Supreme Court was the question whether the evidence that was not in plain view during the unlawful entry should be suppressed. <u>See</u> 468 U.S. at 802 & n.4.

The Supreme Court held that, because the warrant was based on information obtained before the search, the evidence seized was from an independent source and was not fruit of the poisonous tree. See 468 U.S. at 813-14. Thus, whether the entry and occupation of the apartment was unlawful was "irrelevant to the admissibility of the challenged evidence," because of the independent source for the warrant. 468 U.S. at 813. Finding any connection between the unlawful entry and the seizure under the warrant to be sufficiently attenuated, the Supreme Court rejected the argument that the police occupation led to the seizure, because the evidence might otherwise have been destroyed. See 468 U.S. at 815-16.

Segura v. United States was limited to situations where the challenged evidence was not in plain view during an unlawful search. Murray v. United States addressed this question that Segura v. United States left open: whether the independent-source doctrine was available for evidence observed in plain view during an unlawful search. See 487 U.S. at 535. The Supreme Court held that the doctrine also applied to evidence in plain view. See 487 U.S. at 540-41.

Murray v. United States dealt with a situation in which federal law enforcement obtained a warrant for a warehouse after illegally forcing entry to that warehouse. See 487 U.S. at 535-36. Based upon tips from informants, federal agents began surveillance of several defendants. See 487 U.S. at 535. Agents observed two of the defendants entering and then leaving a warehouse, one driving a camper and the other driving a truck. See 487 U.S. at 535. When the defendants left the warehouse, the agents saw two individuals and a tractor-trailer rig with a long container inside. See 487 U.S. at 535. Several other drivers drove the camper and the truck, and ultimately the vehicles were lawfully stopped and found to contain marijuana. See 487 U.S. at 535. After hearing of the marijuana in the vehicles, agents entered the warehouse and saw numerous burlap-wrapped

bales in plain view.  <u>See</u> 487 U.S. at 535.  The agents left and did not reenter the warehouse until later.  <u>See</u> 487 U.S. at 535.  They obtained a warrant, without mentioning the entry or relying upon any observations from that entry, and seized the bales, which contained marijuana.  <u>See</u> 487 U.S. at 535.

The Supreme Court stated that "reseizure of tangible evidence already seized" could be allowed in the right circumstances.  487 U.S. at 542.  "So long as a later, lawful seizure is genuinely independent of an earlier, tainted one . . . there is no reason why the independent source doctrine should not apply."  487 U.S. at 542.  A source for a warrant would not be genuinely independent "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant."  487 U.S. at 542 (footnote omitted).  Although the district court had made factual findings that the unlawful entry was not revealed to the magistrate judge and that the agents did not rely on any observations from the entry in applying for a warrant, the record contained no findings whether the agents would have sought a warrant absent the entry and so the Supreme Court ultimately remanded for a determination in the district court regarding the independent-source doctrine's applicability.  <u>See</u> 487 U.S. at 543-44.

"A source is genuinely independent if the government can show that the evidence was obtained by 'means sufficiently distinguishable to be purged of the primary taint.'"  <u>United States v. Forbes</u>, 528 F.3d at 1278 (quoting <u>Wong Sun v. United States</u>, 371 U.S. at 488).  "By contrast, a source is not independent if, 'granting establishment of the primary illegality, [the evidence has] been come at by the exploitation of the illegality.'"  <u>United States v. Forbes</u>, 528 F.3d at 1278 (alteration in original)(quoting <u>Wong Sun v. United States</u>, 371 U.S. at 488).  To be an independent

source, the source does not need to be temporally distinct from an unlawful search: "It was of no moment that [an illegal search and a lawful independent source] all occurred as part of one brief, uninterrupted sequence of events. Rather, it was enough that a genuinely independent source of the evidence" justify a search. United States v. Forbes, 528 F.3d at 1279.

In support of this principle, the Tenth Circuit has approvingly discussed United States v. Moore, 329 F.3d 399 (5th Cir. 2003). In that case, police allegedly unlawfully arrested a motorist and then conducted a canine search of the vehicle's exterior, leading to the discovery of drugs in the trunk. See United States v. Forbes, 528 F.3d at 1279 (discussing United States v. Moore, 329 F.3d at 404-05). Despite the closeness of the events, the United States Court of Appeals for the Fifth Circuit held that the canine search, which was legal in the circumstances regardless of the arrest's legality, was an independent source and thus the drugs found in the trunk were not subject to suppression. See United States v. Forbes, 528 F.3d at 1279 (discussing United States v. Moore, 329 F.3d at 404-05). Following United States v. Moore, the Tenth Circuit has held that, although officers may have unlawfully searched the trailer of a tractor-trailer rig, a near-simultaneous lawful canine search that revealed drugs in the cab of the rig was an independent source. See United States v. Forbes, 528 F.3d at 1280.

## LAW REGARDING EXIGENT CIRCUMSTANCES

Exigent circumstances may overcome "[t]he presumption of unconstitutionality for warrantless searches." United States v. Mongold, 528 F. App'x at 948. Exigencies may arise from threats to a person's physical safety, the likely destruction of evidence, and the "hot pursuit," United States v. Mongold, 528 F. App'x at 948 (quoting Kentucky v. King, 563 U.S. at 460), of suspects, see United States v. Mongold, 528 F. App'x at 948 (citing Kentucky v. King, 563 U.S.

at 460). In such situations, "the exigencies . . . make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." United States v. Mongold, 528 F. App'x at 948 (internal quotation marks omitted)(alteration in original)(quoting Kentucky v. King, 563 U.S. at 460, and citing United States v. Martinez, 643 F.3d 1292, 1296 (10th Cir. 2011)).

"The existence of exigent circumstances is a mixed question of law and fact." United States v. Martinez, 643 F.3d at 1296 (quoting United States v. Anderson, 981 F.2d 1560, 1567 (10th Cir. 1992)). "The government bears the burden of proving that exigent circumstances rendered a warrantless search reasonable." United States v. Martinez, 643 F.3d at 1296 (citing United States v. Anderson, 154 F.3d at 1233). "[W]hen the exception must justify the warrantless entry of a home," the government's burden is "especially heavy." United States v. Martinez, 643 F.3d at 1296 (quoting United States v. Najar, 451 F.3d 710, 717 (10th Cir. 2006)).

When an exigency involves a "risk of personal danger," United States v. Najar, 451 F.3d 710, 718 (10th Cir. 2006), the Tenth Circuit requires that the government satisfy a two-part test: "(1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable," United States v. Martinez, 643 F.3d at 1296 (internal quotation marks omitted)(quoting United States v. Najar, 451 F.3d at 718). The Tenth Circuit adopted this test after the Supreme Court, in Brigham City v. Stuart, 547 U.S. 398, 406-07 (2006), held officers' subjective motivations irrelevant and probable cause unnecessary for the emergency-aid exception. See United States v. Najar, 451 F.3d at 718. This holding upturned the Tenth Circuit's earlier three-part test, which required that "the search must not be motivated by an intent to arrest or seize

evidence," and that "there must be some reasonable basis, approaching probable cause, to associate the emergency with the place to be searched." United States v. Najar, 451 F.3d at 718 (United States v. Thomas, 372 F.3d 1173, 1177 (10th Cir. 2004)). Accordingly, now, to satisfy "[t]he emergency aid exception," the government must demonstrate "'an objectively reasonable basis for believing that a person within the house is in need of immediate aid,' not on an officer's subjective belief." United States v. Martinez, 643 F.3d at 1296 (quoting Michigan v. Fisher, 558 U.S. 45, 47 (2009)(citations, alteration, and internal quotation marks omitted in United States v. Martinez)).

That the Supreme Court rejected probable cause for the emergency-aid exception has not affected the Tenth Circuit's test for the destruction-of-evidence exception. See United States v. Mongold, 528 F. App'x at 949 (applying United States v. Aquino's test for the destruction-of-evidence exception, which includes a probable cause requirement). Cf. United States v. Najar, No. CR 03-0735 JB, 2004 WL 3426123, at *6 (D.N.M. Sept. 3, 2004)(Browning, J.)("For probable cause in the usual sense not to be needed, the police must be responding to a true emergency rather than a crime, *and* the police must reasonably believe a person inside needs immediate assistance, and entry is needed to protect or preserve life, or to avoid serious injury." (emphasis in original)), aff'd, 451 F.3d 710 (10th Cir. 2006). In the Tenth Circuit, the government must meet a four-part test for such an exception:

> An exception to the warrant requirement that allows police fearing the destruction of evidence to enter the home of an unknown suspect should be (1) pursuant to clear evidence of probable cause, (2) available only for serious crimes and in circumstances where the destruction of the evidence is likely, (3) limited in scope to the minimum intrusion necessary to prevent the destruction of evidence, and (4) supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse.

United States v. Aquino, 836 F.2d at 1272. "The second element includes two components: (a) the exception is only available for serious crimes; and (b) destruction of evidence must be likely." United States v. Mongold, 528 F. App'x at 949.

The Brigham City v. Stuart holding likewise did not affect the hot-pursuit exception. "Hot pursuit occurs when an officer is in 'immediate or continuous pursuit' of a suspect from the scene of a crime." United States v. Jackson, 139 F. App'x 83, 86 (10th Cir. 2005)(unpublished)(quoting Welsh v. Wisconsin, 466 U.S. at 753). "In order for the hot pursuit doctrine to apply, the suspect must have been in a public place 'when the police first sought to arrest' the suspect," Schingel v. City of Albuquerque, No. CIV 07-0481 LH/RLP, 2008 WL 11399547, at *6 (D.N.M. Dec. 18, 2008)(Hansen, J.)(quoting United States v. Santana, 427 U.S. at 42), and the police must have had probable cause to arrest the suspect in the public place, see Schingel v. City of Albuquerque, 2008 WL 11399547, at *7 (citing United States v. Santana, 427 U.S. at 43 ("We thus conclude that a suspect may not defeat an arrest which has been set in motion in a public place, and is therefore proper under [United States v. Watson, 423 U.S. 411 (1976)], by the expedient of escaping to a private place.")). Hot pursuit then requires a chase from that public place. See Garrison v. City of Cushing, 5 F.3d 545, 1993 WL 332284, at *1, *4 (10th Cir. 1993)(unpublished table opinion)(declining to apply the hot-pursuit exception where law enforcement officers entered a home pursuant only to a tip as to a suspect's location). During the chase, if a defendant "seeks to avoid arrest by retreating into a home, an officer may enter to complete the arrest when in 'hot pursuit.'" Gutierrez v. Cobos, No. CIV 12-0980 JH/GBW, 2015 WL 13239104, at *6 (D.N.M. Aug. 25, 2015)(Herrera, J.)(quoting United States v. Santana, 427 U.S. at 42).

The hot-pursuit exception is closely related to the destruction-of-evidence exception. See United States v. Aquino, 836 F.2d at 1271. In United States v. Santana, the Supreme Court reasoned, in part, that the hot-pursuit exception protects against "the significant risk that the [evidence] would no longer be in the [suspect's] possession if the police waited until a warrant could be obtained." United States v. Aquino, 836 F.2d at 1271 (alteration in original)(citing United States v. Santana, 427 U.S. at 44 (Stevens, J., concurring)). Since the Supreme Court has separately recognized the destruction-of-evidence exception, the hot pursuit exception is grounded on "the suspect's flight, which frustrates police efforts to make a legitimate warrantless arrest." United States v. Aquino, 836 F.2d at 1271 (citing United States v. Santana, 427 U.S. at 43). "[A] suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place." United States v. Shelton, No. CR 18-2045 KG, 2018 WL 6069160, at *9 (D.N.M. Nov. 20, 2018)(Gonzales, J.)(quoting United States v. Santana, 427 U.S. at 43).

## ANALYSIS

The Court denies the Motion. It will not suppress the evidence obtained pursuant to the BCSO deputies' search. The Court agrees with the United States' contentions that the BCSO deputies acted reasonably when they entered Cruz' home without a warrant, because they satisfy the destruction-of-evidence exception to warrantless entry. Regarding the disputed issues, the Court concludes that: (i) when Cruz ran from the BCSO deputies and the BCSO deputies had other evidence of Cruz' drug trafficking, the BCSO deputies had probable cause that Cruz was engaged in drug trafficking, or, at least, that Cruz was attempting to traffic drugs; (ii) based on the same facts, the BCSO deputies had probable cause that Cruz possessed drugs, specifically methamphetamine; (iii) drug trafficking is a "serious crime" for purposes of a warrantless entry

into a home for the destruction-of-evidence exception to the warrant requirement; (iv) methamphetamine possession is a "serious crime" for purposes of a warrantless entry into a home for the destruction-of-evidence exception to the warrant requirement; (v) destruction of evidence was likely when Cruz ran from the BCSO deputies and into his residence; (vi) Cruz' running from the BCSO deputies and into his residence indicated an exigency that the BCSO deputies did not manipulate or abuse; (vii) the BCSO deputies were in hot pursuit of Cruz; and (viii) because the BCSO deputies lawfully entered Cruz' residence, no unlawful entry tainted Cruz' consent to search and the exclusionary rule does not apply.

## I. THE BCSO DEPUTIES SATISFIED THE DESTRUCTION-OF-EVIDENCE EXCEPTION.

The United States contends that the BCSO deputies acted lawfully under the destruction-of-evidence exception to the warrant requirement. See Response at 6-8; id. at 10-12. The Court agrees with the United States that Cruz' running from the BCSO deputies created an exigent situation. The Court applies United States v. Aquino's four-part test for the destruction-of-evidence exception. For the BCSO deputies to have satisfied the exception, on the facts here, the exception must be:

> (1) pursuant to clear evidence of probable cause, (2) . . . for serious crimes and in the circumstances where the destruction of the evidence is likely, (3) limited in scope to the minimum intrusion necessary to prevent the destruction of evidence, and (4) supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse.

United States v. Aquino, 836 F.2d at 1272. Following United States v. Mongold, the Court discusses the second element in two-parts: "(a) the exception is only available for serious crimes; and (b) destruction of evidence must be likely." United States v. Mongold, 528 F. App'x at 949. The Court concludes that the United States has satisfied the elements and that the exception

applies.  Accordingly, the BCSO deputies did not act unreasonably when they entered Cruz' home without a warrant.

> **A.     THE BCSO DEPUTIES HAD PROBABLE CAUSE THAT CRUZ WAS ENGAGED IN DRUG TRAFFICKING, OR ATTEMPTING TO TRAFFIC DRUGS, AND EVEN IF THE BCSO DEPUTIES DID NOT HAVE PROBABLE CAUSE THAT CRUZ WAS ENGAGED IN DRUG TRAFFICKING, OR ATTEMPTING TO TRAFFIC DRUGS, THE BCSO DEPUTIES HAD PROBABLE CAUSE THAT CRUZ POSSESSED METHAMPHETAMINE.**

First, the BCSO deputies must have acted pursuant to probable cause.  See United States v. Aquino, 836 F.2d at 1272.  The Court concludes that, given the BCSO deputies' information about Cruz before they encountered him outside his residence, after Cruz started running from the BCSO deputies, they had probable cause that Cruz was trafficking drugs, or, at least attempting to traffic drugs.  Moreover, even if the BCSO deputies did not have probable cause that Cruz was trafficking drugs, after Cruz began running, the BCSO deputies had probable cause that Cruz possessed methamphetamine.

> Probable cause exists where "the facts and the circumstances within their [(the officers')] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed [by the person to be arrested],

Dunaway v. New York, 442 U.S. 200, 208, (1979)(alterations in original)(quoting Brinegar v. United States, 338 U.S. 160, 175-176 (1949)), or that "contraband or evidence of a crime will be found in a particular place," United States v. Rey, 663 F. Supp. 2d at 1111-12 (internal quotation marks omitted)(quoting United States v. Cooper, 654 F.3d 1104, 1124 (10th Cir. 2011)).  "A finding of probable cause rests not on whether particular conduct is 'innocent' or 'guilty,' but on the 'degree of suspicion that attaches' to the Government's evidence."  United States v. Biglow, 562 F.3d 1272, 1281 (10th Cir. 2009)(quoting Illinois v. Wardlow, 528 U.S. 119, 128 (2000)).

"One of the Supreme Court's central teaching[s] on the Fourth Amendment is that probable cause is a practical, nontechnical conception, designed to operate in conjunction with the commonsense, practical considerations of everyday life, rather than the elaborate rules employed by legal technicians." United States v. Rey, 663 F. Supp. 2d at 1111-12 (internal quotation marks omitted)(quoting United States v. Biglow, 562 F.3d at 1281). "Probable cause 'requires only a probability or substantial chance of criminal activity,' rather than 'an actual showing of such activity.'" United States v. Rey, 663 F. Supp. 2d at 1112 (quoting United States v. Biglow, 562 F.3d at 1281).

Preliminarily, the Court looks at all relevant facts when determining probable cause, see United States v. Cantu, 405 F.3d 1173, 1177 (10th Cir. 2005)("While one fact alone may not support a finding of probable cause, a cumulative assessment may indeed lead to that conclusion."), and the Court will not narrow its analysis as Cruz proposes, see Tr. at 42:1-8 (Bhalla); id. at 42:9-14 (Bhalla). The Court will not focus on whether BCSO deputies had probable cause that Cruz had drugs in his home.[9] See Tr. at 42:1-8 (Bhalla). The BCSO deputies did not need probable cause that Cruz stored or had drugs in his home to develop suspicions of criminal activity after he ran from the drug transaction's location. Likewise, the analysis requires a broader view than a snapshot when Cruz left his residence, see Tr. at 42:9-14 (Bhalla), because "the degree of suspicion" began developing before that moment, United States v. Biglow, 562 F.3d at 1281

---

[9]The Court notes that, before Cruz entered his home, the BCSO deputies did not have probable cause that they would find drugs in the residence. The BCSO deputies had no evidence suggesting that Cruz stored drugs in his home and Koppman did not believe that Cruz would store drugs in his home. See Response ¶ 7, at 3; Tr. at 8:19-9:3 (Koppman). When Cruz ran into the home, the BCSO deputies could reasonably believe that Cruz had transported drugs into the building.

(quoting Illinois v. Wardlow, 528 U.S. at 128), and Cruz' running from the BCSO deputies after that moment increased the suspicion.

The CI's and the CS' tips alerted the BCSO deputies to that suspicion. Probable cause, therefore, turns "on the totality of the circumstances, including the informant's veracity, reliability, and basis of knowledge." United States v. Hendrix, 664 F.3d 1334, 1338 (10th Cir. 2011)("Where, as here, probable cause is based on an informant's tip, the court makes a probable cause determination based on the totality of the circumstances, including the informant's veracity, reliability, and basis of knowledge." (citing Illinois v. Gates, 462 U.S. at 230-31; United States v. Quezada-Enriquez, 567 F.3d 1228, 1233 (10th Cir. 2009)). "Veracity concerns the informant's truthfulness; reliability 'entail[s] inquiry into whether the informant has provided accurate information in the past,' and, for basis of knowledge, 'firsthand observation is entitled to greater weight than secondhand information.'" United States v. Streett, No. CR 14-3609 JB, 2018 WL 6182439, at *69 (D.N.M. Nov. 27, 2018)(Browning, J.)(quoting United States v. Quezada-Enriquez, 567 F.3d at 1233). These characteristics "are not absolute, independent requirements that must be satisfied in order for probable cause to exist." United States v. Streett, 2018 WL 6182439, at *69 (internal quotation marks omitted)(quoting United States v. Quezada-Enriquez, 567 F.3d at 1233).

> "An informant's tip which provides 'highly specific or personal details from which one could reasonably infer that the informant had firsthand knowledge about the claimed criminal activity' is more likely to be found sufficient to support probable cause." [United States v. Quezada-Enriquez, 567 F.3d at 1233 (citation omitted).] "Further, an informant's tip is more reliable if it is confirmed by officers' independent observations." *See United States v. Artez*, 389 F.3d 1106, 1111 (10th Cir. 2004)(informant's tip that narcotics are being distributed at a particular location can be corroborated through "controlled buy" at that location).

United States v. Hendrix, 664 F.3d at 1338.

Cruz' attacks on the CI's and the CS' accounts have force when the CI's and the CS' stories are taken in isolation. See Motion at 9-10. Cruz, however, ignores the sources corroborating both the CI's and the CS' information. Probable cause depends on several facts, and "[a] low showing of veracity and reliability alone . . . is not fatal to the probable cause determination, because '[w]hen there is sufficient corroboration of an informant's information there is no need to establish the veracity of the informant.'" United States v. Streett, 2018 WL 6182439, at *69 (quoting United States v. Danhauer, 229 F.3d at 1006).

The Court will not, as Cruz would have it do, deem the CI's information "stale," unreliable, and insufficient for probable cause. Motion at 10 (quoting United States v. Shomo, 786 F.2d at 983). Cruz argues that the CI spoke to Koppman in August -- around a month before Koppman encountered Cruz, offered "only vague references" to Cruz' drug-dealing, and provided "no dates, amounts or other indications the [sic] demonstrated that Cruz was engaged in ongoing illegal drug activity." Motion at 9-10 (citing United States v. Brown, 828 F.3d at 383). The CI's information about Cruz, however, matched Koppman's prior knowledge. See Response ¶1, at 1; Tr. at 7:15-17 (Koppman); Detective Supplemental Report at 2. Koppman recognized as Cruz' the residence and cars that the CI described, and the CI identified Koppman's photograph of Cruz as an image of the "Chino" who was trafficking drugs. Response ¶ 2, at 2. See Response ¶1, at 1; Tr. at 7:15-17 (Koppman); Detective Supplemental Report at 2. See also United States v. Beltran-Lopez, No. CR 10-2309 LH, 2010 WL 11618908, at *4 (D.N.M. Dec. 6, 2010)(Hansen, J.)(stating that an informant's facts were corroborated where evidence linked suspects to a particular residence and specific cars). Moreover, "[o]ngoing and continuous activity," like drug trafficking, "makes the passage of time less critical," United States v. Mathis, 357 F.3d at 1207 (quoting United States v.

Snow, 919 F.2d 1458, 1460 (10th Cir. 1990); and citing United States v. Le, 173 F.3d 1258, 1267 (10th Cir. 1999); United States v. Myers, 106 F.3d 936, 939 (10th Cir. 1997)), and Koppman knew of Cruz' past trafficking activities and the CS' information a month later, see United States v. Artez, 389 F.3d at 1112 ("[C]riminal history, combined with other factors, can support a finding of reasonable suspicion or probable cause[.]" (citing United States v. West, 219 F.3d 1171, 1179 (10th Cir. 2000); United States v. Myers, 106 F.3d at 939; United States v. McCranie, 703 F.2d 1213, 1218 (10th Cir. 1983))); United States v. Mathis, 357 F.3d at 1207 (holding that evidence of drug trafficking spanning two years was not stale).

Cruz' attack on the CS' evidence likewise does not convince the Court. According to Cruz, Koppman recorded no specifics that the CS provided, see Motion at 10, and the CS "had a motive to implicate someone else," because the BCSO deputies had just discovered the CS with "a large amount of methamphetamine," Motion at 10. Koppman tested the CS' veracity, however, "by quizzing the CS about other known drug traffickers, and other information to which Koppman already knew the answers." Response ¶ 5, at 2. Further, the CS identified a picture of Cruz, revealed texting conversations about drug transactions with Cruz, and noted facts that Koppman recognized, such as the identity of the intersection near Cruz' home, descriptions of Cruz' cars, and that Cruz was on probation. See Response ¶ 4, at 2; Response ¶ 5, at 2-3; Tr. at 7:18-23 (Koppman); id. at 8:3-7 (Koppman); id. at 10:20-23 (Koppman); Detective Supplemental Report at 2-3.

Other factors further bolstered the CI's and the CS' accounts. That the CI and the CS spoke from personal knowledge deserves weight, because such a source is a strong basis of knowledge. See United States v. Streett, 2018 WL 6182439, at *69 (quoting United States v. Quezada-

Enriquez, 567 F.3d at 1233); United States v. Mathis, 357 F.3d at 1206 (noting that informants' narratives were strengthened when "each personally knew Mathis and his residence," and that "the information provided by the informants was internally corroborated in several respects"). The CI and the CS also corroborated each other. See United States v. Artez, 389 F.3d at 1111 ("A tip from a second informant can also help corroborate information from a confidential informant." (citing United States v. Sturmoski, 971 F.2d 452, 455-56, 457-58 (10th Cir. 1992))).

Moreover, Cruz' actions on September 5, 2017, significantly increased the "probability" that Cruz was trafficking drugs -- particularly methamphetamine -- and corroborated the accounts. United States v. Rey, 663 F. Supp. 2d at 1112 (quoting United States v. Biglow, 562 F.3d at 1281). Koppman and the other BCSO deputies overheard Cruz agreeing on the telephone to sell the CS several ounces of methamphetamine. See Response ¶ 6, at 3; Tr. at 8:12-14 (Koppman); id. at 13:12-13 (Koppman); id. at 17:9-12 (Stanford, Koppman); id. at 20:25-21:6 (Stanford, Koppman); Detective Supplemental Report at 3. Not only did Cruz agree to the sale in the first telephone conversation, in the second telephone conversation, Cruz confirmed the transaction, his residence's location, and the meeting's timing, and, at the designated time, Cruz left his home at the described location and walked from his residence with the appearance of an individual about to engage in a drug sale. See Response ¶ 8, at 3; Tr. at 13:6-9 (Koppman); id. at 15:10-11 (Koppman); id. at 15:14-17 (Koppman); Detective Supplemental Report at 3. That Cruz then ran when the BCSO deputies approached him at that drug sale location corroborates the CI's and the CS' stories, and indicates his involvement in drug transactions and specifically the planned drug sale. Because a home contains means to destroy or conceal evidence of drugs, a reasonable presumption arises that a suspect running toward a home from a drug sale location possesses a

substance that he or she desires to destroy or hide. As Cruz ran toward his residence, a high probability arose that he possessed such a substance -- the methamphetamine that he had agreed to sell.

Cruz' flight, therefore, gave the BCSO deputies probable cause. See United States v. Hendrix, 664 F.3d 1334, 1338-39 (10th Cir. 2011)(holding that officers' observations of signs that a defendant attempted to hide evidence -- "considerable movement, opening and closing of doors, and a toilet flushing" -- contributed to probable cause). With Cruz' history, the CI's and the CS' information, and the CS' texts and telephone calls, that Cruz ran from the planned drug sale site establishes probable cause that Cruz was engaged in drug trafficking, or, at least attempting to traffic drugs. Even if Cruz' flight does not give probable cause that Cruz was trafficking drugs regularly, it at least establishes probable cause that Cruz possessed methamphetamine at the time.[10]

The authority that Cruz cites does not convince the Court to reach a different conclusion. In United States v. Brown, little evidence corroborated the informant's statements. See 828 F.3d at 382-83. In that case,

> [t]he affidavit did not suggest that a reliable confidential informant had purchased drugs [at Brown's home], that the police had ever conducted surveillance at Brown's home, or that the recorded telephone conversations linked drug trafficking to Brown's residence. The Government note[d] [only] that Brown's car, which was registered to his residence, was parked outside Middleton's home and tested positively for narcotics during a canine search.

---

[10]Although the BCSO deputies recovered heroin as well as methamphetamine from Cruz, see Response ¶ 10, at 4; Detective Supplemental Report at 3, the BCSO deputies had no reason to think that Cruz would have heroin on him. The CS agreed to purchase methamphetamine from Cruz, see Tr. at 13:12-13 (Koppman); id. at 17:9-12 (Stanford, Koppman), and the BCSO deputies knew about only that agreement when approaching Cruz, see Response ¶ 6, at 3; Tr. at 8:12-13 (Koppman); Detective Supplemental Report at 3. Accordingly, probable cause for Cruz' possession of heroin plays no role in this analysis.

828 F.3d at 382-83.  Here, on the other hand, outside evidence, as discussed above, corroborates the CI's and the CS' information.  Similarly, in United States v. Aquino, the police had little to no evidence that Aquino was the individual dealing cocaine until they located the specific apartment from which the cocaine was sold and observed the cocaine being sold.  See 836 F.2d at 1269-70. Further, although Cruz cites several cases for the proposition that a controlled buy, surveillance, or an investigation must corroborate probable cause, see Tr. at 44:13-45:1 (Bhalla), these cases say that such evidence can corroborate probable cause and not that these specific events must occur, see United States v. Cook, 2016 WL 9488763, at *3; United States v. Brown, 828 F.3d at 383; United States v. Aranda-Daiz, 2013 WL 4446801, at *27-28; United States v. Aquino, 836 F.2d at 1272-73.  Sufficient evidence here existed to establish probable cause.  "A man of reasonable caution" could believe that Cruz was engaging in drug trafficking and possessed methamphetamine.  Dunaway v. New York, 442 U.S. at 208 (quoting Brinegar v. United States, 338 U.S. at 175-176).

**B.      DRUG TRAFFICKING IS A SERIOUS CRIME, AND, EVEN IF THE BCSO DEPUTIES DID NOT HAVE PROBABLE CAUSE THAT CRUZ WAS ENGAGED IN DRUG TRAFFICKING, METHAMPHETAMINE POSSESSION IS A SERIOUS CRIME.**

The Court next addresses the first part of United States v. Aquino's second factor.  The Court concludes that, under Tenth Circuit precedent, drug trafficking is a serious crime for purposes of a warrantless entry into a home under the destruction-of-evidence exception. Although no Tenth Circuit caselaw addresses whether methamphetamine possession is a serious crime for such purposes, the Court concludes that such possession is a serious crime for the purposes of a warrantless entry.

No question exists that the Tenth Circuit considers drug trafficking a serious crime for purposes of a warrantless entry into a home under the destruction-of-evidence exception. <u>See</u> <u>United States v. Aquino</u>, 836 F.2d at 1273 ("Our cases indicate that the sale of illegal drugs is a sufficiently severe offense to justify a warrantless entry when police 'have reason to believe that criminal evidence' will be destroyed if they do not immediately enter the premises. (quoting <u>United States v. Cuaron</u>, 700 F.2d at 586)); <u>United States v. Wicks</u>, 995 F.2d 964, 970-71 (10th Cir. 1993)(treating drug trafficking as a serious crime). Accordingly, the Court confidently deems Cruz' drug trafficking a serious crime for purposes of the warrantless entry.

The Court could not find a Tenth Circuit case deciding whether methamphetamine possession is a serious crime for such purposes. <u>See</u> <u>United States v. Famiglietta</u>, 164 F. App'x 695, 698 (10th Cir. 2006)(unpublished)(assuming, "without deciding, that possession of methamphetamine is a sufficiently 'serious crime.'"). If the BCSO deputies did not have probable cause that Cruz was trafficking drugs or attempting to traffic drugs, the Court's analysis must focus on Cruz' crime of possession. The Court, therefore, addresses whether methamphetamine possession is a serious crime.

In arguing that drug possession is not a serious crime, Cruz expands <u>United States v. Mongold</u>'s holding to all drug possession. <u>See</u> Tr. at 46:20-47:9 (Bhalla). <u>United States v. Mongold</u> addresses only marijuana possession. <u>See</u> <u>United States v. Mongold</u>, 528 F. App'x at 949. The Tenth Circuit had previously refused to hold marijuana possession a serious crime, <u>see</u> <u>United States v. Carter</u>, 360 F.3d 1235, 1242 (10th Cir. 2004)("[T]he only crime for which there was probable cause was possession of a small quantity of marijuana, in all likelihood a

misdemeanor, a crime that does not reach the level of 'serious crime' required by *Aquino*."), and, in United States v. Mongold, the Tenth Circuit did not address other drugs.

"Although a 'serious crime' is not well defined, the Supreme Court has explained that penalties are the best indication of whether a crime is 'serious.'" United States v. Betche, 540 F. App'x 838, 842 (10th Cir. 2013). Jailable offenses and felonies constitute sufficiently serious crimes to merit warrantless entries. See Illinois v. McArthur, 531 U.S. 326, 336 (2001)(upholding a warrantless entry where the offenses were punishable by up to thirty days and up to one year in jail, and law enforcement temporarily restricted the defendant's access to his home); Welsh v. Wisconsin, 466 U.S. at 752 (noting that, of the courts addressing a crime's seriousness when analyzing warrantless entry, "most [courts] have refused to permit warrantless home arrests for nonfelonious crimes"). Non-jailable misdemeanors, including misdemeanors for drug possession, are often not serious crimes. See, e.g., United States v. Race, No. 11-CR-6157G, 2015 WL 576171, at *19 (W.D.N.Y. Feb. 11, 2015)(Payson, M.J.)("Several courts have held that the suspected destruction of evidence of a minor crime or violation punishable by a fine, particularly possession of marijuana, is insufficient to justify a warrantless entry into a residence."), report and recommendation adopted, No. 11-CR-6157-FPG, 2015 WL 4678624 (W.D.N.Y. Aug. 6, 2015)(Geraci, C.J.).[11] In United States v. Mongold, for instance, the Tenth Circuit highlighted

---

[11]In United States v. Race, the Honorable Marian Payson, United States Magistrate Judge for the Western District of New York, gave a string cite to support this statement:

*Welsh*[v. Wisconsin], 466 U.S. [740,] 754 [(1984)] ("[t]he [s]tate . . . has chosen to classify the first offense for driving while intoxicated as a noncriminal, civil forfeiture offense for which no prison is possible[;] . . . [g]iven this expression of the [s]tate's interest, a warrantless [home entry] cannot be upheld simply because evidence of the petitioner's blood-alcohol level might have dissipated while the

United States v. Carter's language that "possession of a small quantity of marijuana [was] in all likelihood a misdemeanor." United States v. Mongold, 528 F. App'x at 949 (quoting United States v. Carter, 360 F.3d at 1242). The Tenth Circuit reasoned that, because Oklahoma made marijuana possession a misdemeanor, on the facts at issue, marijuana possession was not a serious crime. See United States v. Mongold, 528 F. App'x at 949-50.

As both federal statutes and State of New Mexico statutes punish methamphetamine possession as a felony, the Court concludes that methamphetamine possession is a serious crime. In New Mexico, methamphetamine possession is a fourth-degree felony, punishable by "eighteen months imprisonment." N.M. Stat. Ann. § 31.18.15(A)(13). See N.M. Stat. Ann. § 30-31-23(E). At the federal level, 21 U.S.C. § 841 makes first-time possession of fifty grams or more of

---

police obtained a warrant"); *United States v. Mongold*, 528 F. App'x at 949 ("if marijuana possession is the only crime for which the officers in this case had probable cause, the exigency exception for destruction of evidence should not apply because marijuana possession is not a serious crime"); *White v. Stanley*, 745 F.3d 237, 241 (7th Cir. 2014)("[t]he possession of a small amount of marijuana is far from that rare case [;] . . . police who simply smell burning marijuana generally face no exigency and must get a warrant to enter the home"); *United States v. Shook*, [No. 1:12-CR-74-BLW,] 2013 WL 2354085, *3 (D. Idaho 2013)[(Winmill, C.J.)]("[s]melling marijuana signals only that someone is smoking pot, a minor misdemeanor that cannot justify a warrantless home entry"); [United States v. ]*Fareed*, No. 01-CR-19E2001,] WL 1432285[,] at *4 [(W.D.N.Y. Nov. 6, 2001)(Eflvin, J.)]("[t]he government has not presented any authority which would justify the forcible warrantless entry into an individual's home based upon [possession of marijuana,] conduct that amounted only to a non-criminal violation"); *Polson v. City of Lee's Summit,* 535 F. Supp. 555, 569 (W.D. Miss. 1982)("[i]t would seem that Fourth Amendment privacy interests have been given priority over the law enforcement interest in rooting out, arresting and punishing marijuana smokers[;][i]n any event, the cases do not allow the odor of burning marijuana to serve in place of a search warrant").

2015 WL 576171, at *19 (alterations to citations added).

methamphetamine a felony punishable by at least ten years in prison, and the statute increases the punishment for subsequent offenses or offenses that violent actions accompany. <u>See</u> 21 U.S.C. § 841(b)(1)(A)(viii). Section 841 punishes possession of five grams or more of methamphetamine with at least five years imprisonment. <u>See</u> 21 U.S.C. § 841(b)(1)(B)(viii). Accordingly, because methamphetamine possession is a jailable felony, methamphetamine possession is a serious crime for the purposes of exceptions to the presumption against warrantless entries.[12]

### C. THE DESTRUCTION OF EVIDENCE WAS LIKELY WHEN CRUZ RAN FROM THE BCSO DEPUTIES AT THE TRANSACTION LOCATION AND INTO HIS RESIDENCE.

The Court turns to the second factor's second part. For this part to be satisfied, Cruz had to have been likely to destroy evidence. <u>See</u> <u>United States v. Aquino</u>, 836 F.2d at 1272. The Court concludes that, when Cruz ran from the BCSO deputies and into his home, the destruction of evidence was likely.

---

[12]Were the Court writing on a clean slate, it would not deem possession of personal-use amounts of methamphetamine to be a serious crime. By looking to penalties to identify "serious crimes," the courts are writing out the "serious crime" element from the Fourth Amendment analysis. Legislatures prescribe imprisonment for numerous offenses. If the Supreme Court and Tenth Circuit desire to minimize this element of the Fourth Amendment test, they may. The Court believes, however, that the Constitutional realm here diverges from the Legislative realm. The Fourth Amendment enshrines protection for our homes. Courts and the common law system can sort out which crimes are sufficiently serious to merit warrantless entries. The Court does not believe that crimes like possession of methamphetamine for personal use, which hurt none but the user, rise to that level.

Here, Cruz possessed methamphetamine with the intent to distribute. The Court differentiates this offense from possession of methamphetamine for personal use. Because possession with the intent to distribute harms society more broadly, the Court is willing to conclude that it is a sufficiently serious offense to justify a warrantless entry.

A reasonable officer could read Cruz' actions to signify that he would destroy evidence. Both law enforcement and courts recognize that defendants can easily destroy or rid themselves of drugs by, for instance, flushing the drugs in the toilet, throwing them over a fence, or throwing them on a roof, and that defendants frequently try to destroy such evidence through these and other means. See Tr. at 17:3-8 (Koppman); United States v. Famiglietta, 164 F. App'x 695, 699 (10th Cir. 2006)(considering "the reality that a small bag of drugs could be quickly and easily destroyed"); United States v. Radka, 904 F.2d at 361 ("[N]arcotics can be easily destroyed while a search is progressing[.]"); Thomas v. Vaughn, 2006 WL 2375657, at *8 (differentiating the evidence in the case -- the weapon used in and the money obtained from a robbery -- from drug evidence, which "is easily destroyed," and considering the evidence's nature in determining the likelihood that the defendants would destroy it). Cruz knew that the BCSO deputies had an interest in his activities, because they identified themselves at the drug sale location. See United States v. Aquino, 836 F.2d at 1273 (considering a defendant's suspicions when upholding that evidence's destruction was likely); United States v. Socey, 846 F.2d 1439, 1442, 1458 (D.C. Cir. 1988)(treating the defendants' awareness of law enforcement's presence as an indication that the defendant would destroy evidence); United States v. Elkins, 732 F.2d 1280, 1285 (6th Cir. 1984)(same). Cruz' home likely contained a toilet or other means through which he could destroy or hide the methamphetamine, and Cruz unlikely planned to run into his home to prevent his arrest if the BCSO deputies sought to arrest him. That Cruz ran from the BCSO deputies and into his home, therefore, signaled that he likely planned to destroy evidence -- the methamphetamine from the planned drug sale. See, e.g., United States v. Canas, 462 F. App'x 836, 837-39 (10th Cir. 2012)(unpublished)(upholding that running around and not addressing the law enforcement

officers at the door established that destruction of evidence was likely); United States v. Ramirez-Fragozo, 490 F. App'x 125, 126-27 (10th Cir. 2012)(unpublished)(upholding that destruction of evidence was likely on similar facts to United States v. Canas).  The BCSO deputies' "experience in prior narcotics investigations provided foundation for the officers' belief that [the methamphetamine] could be concealed or destroyed within a short period of time," United States v. Chavez, 812 F.2d 1295, 300 (10th Cir. 1987), and such experience reasonably counseled that Cruz would attempt such destruction.

The Court disagrees with Cruz that, to meet this element, the BCSO deputies must have seen or heard Cruz destroying evidence.  See Tr. at 48:15-22 (Bhalla).  Courts frequently uphold the likelihood of evidence's destruction when law enforcement officers do not observe the destruction, but the officers know that a defendant has become aware of law enforcement officers' interests in his or her activities or of their presence near the evidence.  See, e.g., United States v. Aquino, 836 F.2d at 1273 (noting that Aquino was likely to destroy evidence before law enforcement officers arrived at his apartment, because he likely grew suspicious of police activity after the officers released from custody other individuals who were involved in the cocaine trade and a telephone call to the informant's apartment indicated another individual's suspicions); United States v. Socey, 846 F.2d at 1442, 1458 (indicating that defendants may destroy evidence when a "commotion would alert those in the house to the police presence"); United States v. Chavez, 812 F.2d at 1297-300 (concluding that "[t]he extinguishment of lights and the closing of the doors of the garage, as well as the departure of one of the employees, provided reasonable grounds for the officers to become concerned that the occupants were aware of the officers' surveillance," and that  the officers could reasonably conclude that the defendants would likely

destroy evidence); United States v. Elkins, 732 F.2d 1280, 1285 (6th Cir. 1984)(stating that destruction of evidence was likely where law enforcement vehicles would have alerted people within a house of the law enforcement officers' presence). Moreover, requiring that law enforcement see or hear indications that a suspect was concurrently destroying evidence would defeat the exception's purpose. The exception should permit law enforcement officers to effectively perform their duties -- including safeguarding evidence -- when they lack the time or the opportunity to obtain a warrant. If judges were to mandate the partial destruction of evidence before finding the exception applicable, such judges would substantially hobble -- if not wholly impede -- efforts to preserve complete evidence.

Cruz also ignores the similarities between his actions and those of individuals actively or imminently destroying evidence. If, after law enforcement officers announce their presence, signs of running, slamming doors, and avoiding the police within a house indicate evidence's destruction, similar actions -- like running and avoiding the police -- outside and leading inside the home, in which evidence may be destroyed, should likewise be capable of carrying such implications. See, e.g., United States v. Canas, 462 F. App'x at 837-39 (holding that destruction of evidence was likely, when, after an informant gave officers an address from which individuals distributed heroin, and the officers who knocked on the residence's door "heard running, loud talking, and the sounds of doors or cabinets slamming"); United States v. Ramirez-Fragozo, 490 F. App'x at 126-27 (upholding that destruction of evidence was likely on similar facts to United States v. Canas). The BCSO deputies could reasonably believe that a defendant running into a house from the location of a planned drug sale, like the people running inside a house, hoped to reach a room in which he could hide his participation in drug crimes. The Court, therefore,

concludes that the BCSO deputies confronted more than "the mere possibility that . . . evidence could be destroyed." Tr. at 48:5-8 (Bhalla)(internal quotation marks omitted)(quoting <u>Thomas v. Vaughn</u>, 2006 WL 2375657, at *8). The United States satisfies this part of the second element.

### D. THE BCSO DEPUTIES LIMITED THEIR SEARCH TO THE EXTENT NECESSARY TO PREVENT THE DESTRUCTION OF EVIDENCE.

Third, the Court considers whether the BCSO deputies limited their search to the extent necessary to prevent the destruction of evidence. <u>See United States v. Aquino</u>, 836 F.2d at 1272. Cruz devotes little to no time debating the third factor. He states only that, because the United States cannot establish the other elements, he need not discuss this factor. <u>See</u> Tr. at 48:22-49:3 (Bhalla). As the Court concludes that the United States can establish the other elements, the Court must consider whether the United States can also satisfy this factor. The Court concludes that the BCSO deputies narrowed their search to the extent necessary to avoid the destruction of evidence.

The BCSO deputies limited their search as the third element requires. The BCSO deputies entered Cruz' home initially only so far as required to arrest him outside the bathroom. <u>See</u> Response ¶ 10, at 4; Tr. at 23:2-4 (Koppman); Detective Supplemental Report at 3-4. The BCSO deputies proceeded to search no further in the house until Cruz gave his consent. <u>See</u> Tr. at 24:18-25 (Stanford, Koppman). <u>See also United States v. Scroger</u>, 98 F.3d 1256, 1260 (10th Cir. 1996)(upholding a search when "the warrantless entry and protective sweep were limited in scope to ensure the safety of the officers and the residence," and the officers waited for further authority to commit a search before conducting a "full search of the residence"). As obtaining custody over Cruz was necessary to prevent him from destroying evidence, the BCSO deputies entered Cruz' home only to the extent necessary. The United States, therefore, has shown this element satisfied.

### E.  CRUZ' RUNNING FROM THE BCSO DEPUTIES AND INTO HIS RESIDENCE INDICATES AN EXIGENCY NOT SUBJECT TO POLICE MANIPULATION OR ABUSE.

Last, the United States must show that the destruction-of-evidence exception is "supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse." United States v. Aquino, 836 F.2d at 1272.  The Court discusses two parts to this element: (i) whether an exigency arose; and (ii) law enforcement's role in creating the exigency.  See United States v. Hendrix, 664 F.3d 1334, 1339 (10th Cir. 2011)(discussing, first, whether exigent circumstances existed and, second, law enforcement officers' roles in creating the exigency).  The Court concludes that the United States meets this element.  First, an exigency existed, because Cruz would likely imminently destroy evidence if the BCSO deputies did not intervene.  Second, under Kentucky v. King, the BCSO deputies acted lawfully and did not a warrant.

First, the circumstances indicated that the BCSO deputies faced an exigency.  Much of the Court's analysis of this element's first part overlaps with the discussion in the Analysis' Section I(C) about the likelihood that Cruz would destroy the evidence.[13]  "When officers have reason to

---

[13]The Court analyzes separately the likelihood that evidence would be destroyed and the indicators that an exigency exits.  Other courts, however, conflate the two considerations.  See United States v. Famiglietta, 164 F. App'x at 698-99 ("[T]he likelihood that the evidence would be destroyed created sufficient exigent circumstances for Officer Wadley to enter the apartment."); United States v. Anderson, 154 F.3d 1225, 1233-34 (10th Cir. 1998)(discussing in one analysis "the government's failure to demonstrate the presence of any 'circumstances where the destruction of evidence is likely' or any 'clearly defined indications of exigency'"); United States v. Estrada, No. 1:11-CR-101 TS, 2012 WL 2367992, at *3-4 (D. Utah June 21, 2012)(Stewart, J.)(summarizing the test for the destruction-of-evidence exception as requiring probable cause and exigent circumstances); United States v. Macias-Treviso, 42 F. Supp. 2d 1206, 1216 (D.N.M. 1999)(Parker, J.)(addressing the crime's seriousness as the second element, and the indications of exigency and concerns about the evidence's destruction as the fourth element).  The Court cannot discern a pattern signaling under which element it should address the likelihood of evidence's destruction and the exigency's existence.  The Court chooses to discuss each factor separately, because the Tenth Circuit listed them as distinct in United States v. Aquino.

believe that criminal evidence may be destroyed . . . or removed, . . . before a warrant can be obtained, the circumstances are considered sufficiently critical to permit officers to enter a private residence in order to secure the evidence while a warrant is sought." United States v. Cuaron, 700 F.2d at 586 (citations omitted). Cruz knew that the BCSO deputies suspected him, and once in his home, Cruz could quickly destroy evidence. See Kentucky v. King, 563 U.S. at 455-57 (upholding an exigency exception when law enforcement heard noises implying the destruction of evidence); United States v. Aquino, 836 F.2d at 1273-74 (upholding application of the destruction-of-evidence exception when the defendant suspected the police's attention). The facts suggest no time in which the BCSO deputies could have obtained a warrant. Cf. United States v. Mongold, 528 F. App'x at 948 (explaining that "the exigencies . . . make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment" (internal quotation marks omitted)(alteration in original)(quoting Kentucky v. King, 563 U.S. at 460)). The Court, therefore, concludes that indicators of an exigency existed.

Second, Cruz' argument that the Court should not apply the destruction-of-evidence exception, because the BCSO deputies created an exigency or because the BCSO deputies should have obtained a warrant, does not convince the Court. Kentucky v. King governs here. In Kentucky v. King, the Supreme Court held:

> [T]he answer to the question before us is that the exigent circumstances rule justifies a warrantless search when the conduct of the police preceding the exigency is reasonable in the same sense. Where, as here, the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed

Kentucky v. King, 563 U.S. at 462. The Supreme Court directly rejected the argument that law enforcement officers must seek a warrant immediately on obtaining probable cause or in situations

in which exigencies might arise.  See Kentucky v. King, 563 U.S. at 466 (describing that such an

"approach unjustifiably interferes with legitimate law enforcement strategies.  There are many

entirely proper reasons why police may not want to seek a search warrant as soon as the bare

minimum of evidence needed to establish probable cause is acquired.").  Kentucky v. King leaves

narrow the circumstances in which law enforcement actions will impermissibly create exigencies.

In United States v. Hendrix, for instance, the Tenth Circuit held that, under Kentucky v. King, a

warrantless entry was lawful, although law enforcement officers went "directly to the motel room

at night without first seeking a warrant or further corroboration of the informant's tip, [gave] a

false name, and continually [demanded] entry after initially being refused."  United States v.

Hendrix, 664 F.3d at 1339-40.  Here, Cruz, like Hendrix, presents no evidence that the BCSO

deputies "threatened to enter [his residence] without permission unless admitted."  United States

v. Hendrix, 664 F.3d at 1340.  The BCSO deputies did not "engag[e] or threaten . . . to engage in

conduct that violates the Fourth Amendment."  Kentucky v. King, 563 U.S. at 462.  They did not

even go to Cruz' residence intending to or expecting to need to enter his home.  Accordingly, the

Court concludes that United States v. Aquino's fourth element is satisfied and that the BCSO

deputies met the destruction-of-evidence exception to warrantless entries.  The BCSO deputies,

therefore, acted constitutionally when they entered Cruz' home without a warrant.

## II.    THE BERNALILLO OFFICERS ENTERED CRUZ' HOME LAWFULLY IN A HOT PURSUIT OF CRUZ.

The United States also argues that the BCSO deputies acted pursuant to the hot-pursuit

exception to the warrant requirement.  See Response at 6; id. at 8-9.  The Court concludes that the

BCSO deputies entered Cruz' home lawfully under this exception.  To satisfy the hot-pursuit

exception, the United States must establish that the BCSO deputies had probable cause to arrest

Cruz in a public place, and that the BCSO deputies chased Cruz immediately and continuously from that public place into the home to complete the arrest. See Schinagel v. City of Albuquerque, 2008 WL 11399547, at *6-7; United States v. Jackson, 139 F. App'x at 86 (quoting Welsh v. Wisconsin, 466 U.S. at 753). As discussed in the Analysis' Section I(A), the Court concludes that the BCSO deputies had probable cause that Cruz was trafficking drugs, or attempting to traffic drugs, and that he possessed methamphetamine. The BCSO deputies developed this probable cause when Cruz began running in a public place, outside his home. See Response ¶ 8, at 3; id. ¶ 10, at 4; Tr. at 15:14-17 (Koppman); id. at 16:20 (Koppman); Detective Supplemental Report at 3-4. The BCSO deputies were attempting to take Cruz into custody as they chased him and ordered him to stop. See Response ¶ 10, at 4; Tr. at 16:20 (Koppman); id. at 37:10-16 (Bhalla, Koppman); Detective Supplemental Report at 3-4. They followed Cruz from the planned drug sale's location into his home. See Response ¶ 10, at 4; Tr. at 22:25-23-1 (Koppman); id. at 27:8-10 (Koppman). See also Garrison v. City of Cushing, 5 F.3d 545 (10th Cir. 1993)("[H]ot pursuit generally requires some sort of a chase, however short it may be." (citing United States v. Santana, 427 U.S. at 43)). Only once within Cruz' home did the BCSO deputies take Cruz into custody. See Tr. at 23:3 (Koppman). The hot-pursuit exception hence applies.

Cruz' distinction between his circumstances and the facts in United States v. Santana does not sway the Court. Cruz distinguishes his situation by noting that, in United States v. Santana, a complete drug buy occurred. See Reply at 4-5. This fact, however, speaks to whether officers had probable cause and not to whether an exigency arose. See United States v. Santana, 427 U.S. at 42-43 (addressing whether the attempt to arrest began in a public place and whether the pursuit permitted entry into Santana's house, and not analyzing the drug transaction or probable cause).

The Court has already addressed whether the BCSO deputies had probable cause that Cruz was engaging in or attempting to engage in drug trafficking, and whether he possessed methamphetamine. Accordingly, the Court concludes that the United States has met its burden to establish that a hot pursuit occurred.

III.   **BECAUSE THE BCSO DEPUTIES DID NOT UNLAWFULLY ENTER CRUZ' HOME, THE EXCLUSIONARY RULE DOES NOT REQUIRE THAT THE COURT EXCLUDE EVIDENCE OBTAINED PURSUANT TO THE SEARCH.**

Cruz asks that, after the Court deems the BCSO deputies' warrantless entry unlawful, the Court suppress the evidence obtained pursuant to the entry -- the methamphetamine, heroin, firearms, and Cruz' statements. See Motion at 5. As the BCSO deputies did not unlawfully enter Cruz' home, however, the exclusionary rule does not require that the Court exclude the evidence.[14]

---

[14]Cruz is correct that, if the BCSO deputies unlawfully entered his home, the Court would suppress the evidence obtained pursuant to the search. No exceptions to the exclusionary rule permit the evidence here. First, the Court declines to apply here the good-faith exception. The Supreme Court has held that evidence will not be excluded where the officer who obtained the evidence -- through an unlawful search or seizure -- acted in good faith. See United States v. Davis, 564 U.S. at 236-37. No evidence here reveals such good faith errors. The entirety of the occurrence here boils down to the BCSO deputies learning information from the CI and CS and then chasing Cruz into his home.

Second, the Court deems the inevitable-discovery doctrine inapplicable. "The inevitable discovery doctrine provides an exception to the exclusionary rule, and permits evidence to be admitted 'if an independent, lawful police investigation inevitably would have discovered it.'" United States v. Cunningham, 413 F.3d at 1203 (citations omitted)(quoting United States v. Owens, 782 F.2d at 152; and citing Nix v. Williams, 467 U.S. at 444, 448; United States v. Romero, 692 F.2d at 704)). The Tenth Circuit adopted four factors to determine "how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to a warrant":

1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search"; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) "evidence that law enforcement agents 'jumped

See Sanchez-Llamas v. Oregon, 548 U.S. at 348; Wong Sun v. United States, 371 U.S. at 484.

The Court, accordingly, will admit the evidence and denies the Motion.

_____

the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."

United States v. Souza, 223 F.3d at 1204 (citations omitted)(quoting United States v. Cabassa, 62 F.3d at 473-74, 473 n.2). Here, the Court cannot say soundly that the BCSO deputies would have obtained the evidence with a warrant: (i) the BCSO deputies had not begun the warrant process before the search; (ii) although the BCSO deputies had evidence implicating Cruz, the BCSO deputies lacked probable cause until Cruz ran immediately before the search; (iii) the BCSO deputies did not ultimately obtain a warrant; and (iv) the BCSO deputies did not jump for the search before getting their warrant. See United States v. Souza, 223 F.3d at 1204. The Court confronts an inherent intellectual tension between saying that the BCSO deputies had to enter the home to protect imminent destruction of the drugs and saying that, if the BCSO deputies had waited and obtained a warrant, the drugs would have still been there; the Court cannot and will not try to have it both ways. The BCSO deputies obtained some evidence, because they interrupted Cruz' attempt to destroy the evidence. Had the BCSO deputies returned later with a warrant, Cruz likely would have destroyed or hidden evidence, and/or not have uttered the statements that he admitted when the BCSO deputies caught him in the act of destroying evidence. See United States v. Martinez, 696 F. Supp. 2d at 1244 ("[C]ourts should be realistic, if not skeptical, when assessing the probability that law-enforcement officers would inevitably have uncovered the challenged evidence through an independent investigation."). Likewise, had the BCSO deputies waited for more evidence and had the BCSO deputies not interrupted Cruz, they may have unearthed drugs and firearms on Cruz and in his home, and may even have recovered the same firearms discovered on September 5, 2017. The BCSO deputies, however, likely would not have recovered the same drugs discovered on September 5, 2017, as those drugs' locations -- Cruz' pockets, the purse, and the vehicles -- suggest that Cruz would likely have moved those substances. The BCSO deputies, therefore, would not have inevitably discovered this evidence.

Third, the independent-source doctrine does not apply. Under the independent-source doctrine, evidence that is obtained based upon information unrelated to an unlawful search is not fruit of the poisonous tree. See Segura v. United States, 468 U.S. at 799 (citing Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920)). "A source is genuinely independent if the government can show that the evidence was obtained by 'means sufficiently distinguishable to be purged of the primary taint.'" United States v. Forbes, 528 F.3d at 1278 (quoting Wong Sun v. United States, 371 U.S. at 488). As with the inevitable-discovery doctrine, a subsequent search pursuant to a warrant can make admissible evidence otherwise tainted by an initial warrantless search. See Murray v. United States, 487 U.S. at 535. The BCSO deputies did not otherwise obtain the evidence from Cruz. Accordingly, this doctrine does not apply.

**IT IS ORDERED** that the Defendant Jose Jesus Cruz's Motion to Suppress Evidence and

Statements, filed October 22, 2018 (Doc. 25), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John C. Anderson
  United States Attorney
Jon K. Stanford
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Carey Corlew Bhalla
Carey C. Bhalla, LLC
Albuquerque, New Mexico

    *Attorney for the Defendant*